## CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD CO. *v.* ILLINOIS ET AL.

No. 12.   Argued November 12, 1957.—Decided January 13, 1958.*

---

*Together with No. 27, *United States* v. *Illinois et al.*, and No. 28, *Interstate Commerce Commission* v. *Illinois et al.*, also on appeals from the same Court.

*R. K. Merrill* argued the cause for appellant in No. 12. With him on the brief were *W. J. Quinn* and *Edwin R. Eckersall.*

*Solicitor General Rankin* submitted on brief for the United States, appellant in No. 27.

*Charlie H. Johns, Jr.* argued the cause for the Interstate Commerce Commission, appellant in No. 28. With him on the brief was *Robert W. Ginnane.*

*Harry R. Begley,* Special Assistant Attorney General, argued the cause for the State of Illinois and the Illinois Commerce Commission, appellees. With him on the brief were *Latham Castle,* Attorney General, and *Elmer M. Walsh, Jr.,* Assistant Attorney General.

*S. Ashley Guthrie* argued the cause for the Milwaukee Road Commuters' Association, appellee. With him on the brief were *Henry F. Tenney* and *Francis D. Fisher.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The State of Illinois, the Illinois Commerce Commission, and the Milwaukee Road Commuters' Association, aggrieved by an order of the Interstate Commerce Commission fixing intrastate passenger fares for the Milwaukee Road's Chicago suburban commuter service higher than the fares authorized by the State Commission, brought this action in the District Court for the Northern District of Illinois, Eastern Division, seeking

relief under 28 U. S. C. § 1336. The ICC order, 297 I. C. C. 353, was made under 49 U. S. C. § 13 (4),[1] which authorizes the ICC to prescribe intrastate fares if it finds that ". . . any such . . . [existing intrastate] fare . . . causes . . . any undue, unreasonable, or unjust discrimination against interstate . . . commerce." The three-judge District Court set aside the order, enjoined its enforcement,[2] and remanded the case to the ICC for further proceedings. 146 F. Supp. 195. The District Court held, *inter alia,* that the ICC failed to make findings appropriate to show that the existing fares caused undue, unreasonable or unjust discrimination against interstate commerce. The judgment was appealed under 28 U. S. C. § 1253.[3] We noted probable jurisdiction, 352 U. S. 939.

---

[1] 24 Stat. 383, as amended, 41 Stat. 484, 49 U. S. C. § 13 (4):

"Whenever in any such investigation the commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

[2] The injunction was stayed pending the hearing of the appeal to this Court. The excess fares are being impounded under a provision of the stay order providing for their refund to the persons who paid them in the event the judgment appealed from is affirmed.

[3] The Milwaukee Road is the appellant in No. 12. The United States is the appellant in No. 27. The ICC is the appellant in No. 28. Each appeals from the particular provisions of the judgment by which it is aggrieved.

The ICC found that the Milwaukee Road's 1954 passenger revenues from the Chicago suburban commuter service fell short by $306,038 of meeting the out-of-pocket cost of the service. This was the basis of the conclusion that the existing intrastate fares caused undue discrimination against interstate commerce. To remove this discrimination the ICC prescribed fares to produce $383,000 additional annual revenue, enough to eliminate the determined out-of-pocket loss and to allow $77,000 annually as a contribution to indirect costs and taxes. The question for our decision is whether the District Court properly set aside the ICC order as void for lack of findings necessary to support an order under § 13 (4).

The Chicago suburban commuter service, except for a relatively insignificant exception mentioned below, is entirely an intrastate service. It is provided in two directions from Chicago's Union Station. One direction, wholly within Illinois, is west from Chicago some 37 route miles to Elgin, Illinois. The other direction is north from Chicago to Walworth, Wisconsin; however, 62 of the 74 route miles in that direction, and 24 of the 26 station stops, are located within Illinois.[4] Total 1954 passenger revenues from this service were $1,796,231 from 4,869,064 passengers. Commuters traveling on commutation and

---

[4] The interstate fares to the two Wisconsin points were also raised in this proceeding by an ICC order entered November 21, 1955, and Order No. 26550, *Passenger Fares and Surcharges,* 214 I. C. C. 174, was modified so as to permit the rates to be made effective. No affirmative order raising the intrastate rates was made, however, until March 2, 1956. The ICC report allowed the Milwaukee Road and the Illinois Commerce Commission 60 days in which to adjust the intrastate rates on the bases prescribed in the report. Failing such adjustment the order of March 2, 1956, prescribing the intrastate rates was entered and Order No. 11703, *Intrastate Rates Within Illinois,* 59 I. C. C. 350, was modified to permit the Milwaukee Road to make the intrastate rates effective.

multiple-ride tickets numbered 3,910,526 of this total and accounted for $1,374,261 of the revenue.

Commuter fares of most of the railroads providing commuter service in the Chicago area have been determined, at least since 1950, in joint hearings conducted by the ICC and the State Commission under 49 U. S. C. § 13 (3).[5] 297 I. C. C. 353, 354. On July 24, 1952, however, the Milwaukee Road, instead of filing petitions or schedules with both Commissions, filed a petition with the State Commission only requesting

> "authority to discontinue all off-peak Chicago suburban passenger trains and consolidate certain peak-hour trains and also to increase one-way, round-trip and commutation fares to such extent as will after taking into consideration the economy effected by

---

[5] 24 Stat. 383, as amended, 41 Stat. 484, 49 U. S. C. § 13 (3):

"Whenever in any investigation under the provisions of this chapter, or in any investigation instituted upon petition of the carrier concerned, which petition is authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any State, the commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding. The commission may confer with the authorities of any State having regulatory jurisdiction over the class of persons and corporations subject to this chapter or chapter 12 of this title with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such State regulating bodies on any matters wherein the commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the commission. The commission is also authorized to avail itself of the cooperation, services, records, and facilities of such State authorities in the enforcement of any provision of this chapter or chapter 12 of this title."

such discontinuances and consolidation of trains, give respondent sufficient revenues to permit operation of the Chicago suburban service without an out-of-pocket loss." 297 I. C. C., at 355.

The State Commission did not act on the application until 1954. Meanwhile the Milwaukee Road changed the suburban service from a steam to a diesel operation. The State Commission found that the cost savings effected by this change eliminated the out-of-pocket loss and, on November 10, 1954, denied the application. The Milwaukee Road thereupon, in February 1955, petitioned the ICC for relief under § 13 (4).

This case presents once again the problem of adjusting state and federal interests in the regulation of intrastate rates. These intrastate rates are primarily the State's concern and federal power is dominant "only so far as necessary to alter rates which injuriously affect interstate transportation." *North Carolina* v. *United States,* 325 U. S. 507, 511. Thus, whenever this federal power is exerted within what would otherwise be the domain of state power, the justification for its exercise must "clearly appear." *Florida* v. *United States,* 282 U. S. 194, 212. The statute provides a practical method of minimizing the inevitable irritations inherent in the conflict by requiring the ICC to notify the State whenever there is brought before it any fare imposed by state authority. In addition, the ICC may confer with the state regulatory authority, or may hold joint hearings with the state agency, when the State's rate-making authority may be affected by the action taken by the ICC. 49 U. S. C. § 13 (3).

The occasion for the exercise of the federal power asserted by § 13 (4) is the necessity for effecting the required contribution by intrastate traffic of its proportionate share of the revenues necessary to pay a carrier's

operating cost and to yield a fair return.[6]   When intrastate revenues fall short of producing their fair proportionate share of required total revenues, they work an undue discrimination against interstate commerce, and the ICC may remove the discrimination by fixing intrastate rates high enough reasonably to protect interstate commerce.   *Illinois Commerce Comm'n* v. *United States,* 292 U. S. 474, 479; *Wisconsin R. Comm'n* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563, 586; *United States* v. *Louisiana,* 290 U. S. 70, 75.   In determining whether an undue revenue discrimination against interstate commerce is caused by intrastate rates, the ICC may consider "among other things, the need, in the public interest, of adequate and efficient railway transportation service and the need of revenues sufficient to sustain such service," a standard written into 49 U. S. C. § 15a (2).   *King* v. *United States,* 344 U. S. 254, 264.   No formal requirements are prescribed for the findings to be made by the ICC under § 13 (4).   *United States* v. *Louisiana,* 290 U. S. 70, 80.   Reasonable determinations suffice.   *Florida* v. *United States,* 292 U. S. 1, 9.   But the justification for the exercise of this exceptional federal power to interfere with intrastate rates must be made definitely and clearly apparent.   *Florida* v. *United States,* 282 U. S. 194, 212.

In the instant case the ICC interfered with suburban commuter rates—intrastate rates peculiarly localized in impact upon the Chicago suburban community.   In substance, the ICC found that because this single segment of the Milwaukee Road's intrastate operations in Illinois did not meet out-of-pocket costs, there was an undue

---

[6] *Wisconsin R. Comm'n* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563, 586.   "The effective operation of the [Interstate Commerce] act will reasonably and justly require that intrastate traffic should pay a fair proportionate share of the cost of maintaining an adequate railway system."

discrimination against the road's interstate operations, without regard to the contribution of other Illinois intrastate revenues, freight or passenger, concerning which both the record and the findings are entirely silent.

We think this is a case where the ICC cannot be sustained in altering intrastate rates merely because the Chicago suburban commuter traffic—of the Milwaukee Road's total intrastate Illinois traffic, freight and passenger—is not remunerative or reasonably compensatory. Cf. *Florida* v. *United States,* 282 U. S. 194; *North Carolina* v. *United States,* 325 U. S. 507. The limited and exceptional federal power asserted by § 13 (4) over intrastate rates must be exercised with "scrupulous regard for maintaining the [primary] power of the state in this field." *North Carolina* v. *United States,* 325 U. S. 507, 511. It is of course desirable that each particular intrastate service should as nearly as may be pay its own way and return a profit—but the State Commission, not the ICC, has the responsibility in the first instance to achieve that desired end. Passenger deficits have become chronic in the railroad industry and it has become necessary to make up these deficits from more remunerative services. The ICC has recognized this practical reality of today's railroading and has changed its rate-fixing policy so that if interstate passenger service inevitably and inescapably cannot bear its direct costs and its share of joint or indirect costs, the ICC feels compelled in a general rate case to take the passenger deficit into account in the adjustment of interstate freight rates and charges. *King* v. *United States,* 344 U. S. 254, 261. An equally broad power must be conceded to a state commission in the exercise of its primary authority to prescribe and adjust intrastate rates.

In view of that policy, we do not think that the deficit from this single commuter operation can fairly be adjudged to work an undue discrimination against the Mil-

waukee Road's interstate operations without findings which take the deficit into account in the light of the carrier's other intrastate revenues from Illinois traffic, freight and passenger. The basic objective of § 13 (4), applied in the light of § 15a (2) to this case, is to prevent a discrimination against the carrier's interstate traffic which would result from saddling that traffic with an undue burden of providing intrastate services. A fair picture of the intrastate operation, and whether the intrastate traffic unduly discriminates against interstate traffic, is not shown, in this case, by limiting consideration to the particular commuter service in disregard of the revenue contributed by the other intrastate services.[7]

A requirement for findings which reflect the commuter service deficit in the totality of intrastate revenues is not a departure from previous holdings of this Court. The precise situation presented by this case has not heretofore been considered by the Court. The previous cases involving Commission orders increasing intrastate rates in the interest of the carrier's revenue (as distinguished from cases of discrimination against particular persons and localities, see *Houston, E. & W. T. R. Co.* v. *United States,* 234 U. S. 342) involved statewide orders raising intrastate rates. In passenger fare cases, ICC orders were sustained on a showing that following general increases in interstate passenger rates, state commissions refused to increase intrastate passenger rates to the same level for what were essentially identical services. *Wiscon-*

---

[7] This would seem to be particularly required here in light of the Commission's recognition "that the deficit from the [Milwaukee Road's] total passenger operations is relatively greater than from its suburban operations." 297 I. C. C. 353, 359.

The Commission found that the Milwaukee Road earned in 1954 from its freight operations $37,293,050, and suffered a deficit from all passenger operations of $22,824,532, resulting in a net railway operating income of $14,568,518. This represented a return of approximately 2%.

*sin R. Comm'n* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563; *New York* v. *United States,* 257 U. S. 591. It was held that the state passenger rates in that circumstance were not producing their fair proportionate share. In *North Carolina* v. *United States,* 325 U. S. 507, also a passenger fare case, the ICC order was not sustained because the findings were held to be insufficient. Nonpassenger fare cases in which ICC orders raising intrastate rates were sustained were *United States* v. *Louisiana,* 290 U. S. 70; *Florida* v. *United States,* 292 U. S. 1; and *King* v. *United States,* 344 U. S. 254. The order was not sustained, however, in an earlier Florida case, *Florida* v. *United States,* 282 U. S. 194. The only case ostensibly based upon a revenue discrimination caused by a local operation was not a passenger fare case. *Illinois Commerce Comm'n* v. *United States,* 292 U. S. 474. Basically the discrimination there complained of, however, was a persons-and-locality discrimination against interstate shippers.

It should also be noted that in *King* v. *United States, supra,* the Court adverted to those very factors among the ICC's findings whose absence in the present case we find to be a fatal defect. The Court there emphasized the ICC finding that the entire intrastate traffic, freight and passenger, constituted a revenue drain upon the carrier's revenues from interstate traffic. Since the Commission has not in this case found whether or not the commuter rates, viewed in the light of the Illinois intrastate operation as a whole, constitute an undue revenue discrimination against the Milwaukee Road's interstate operations, the judgment of the District Court in remanding the case to the Commission for further consideration must be affirmed.[8]

---

[8] We agree with the District Court that that portion of the prescribed increases designed to produce $77,000 annually as a contribution to indirect costs and taxes is not based upon adequate findings. There is no finding of the total of indirect costs and taxes to which

The District Court also held that the ICC erred in considering evidence which was not presented by the Milwaukee Road to the State Commission. The evidence in question concerned certain depreciation and maintenance-of-way expenses totaling $258,172, which the ICC took into account in computing out-of-pocket costs. The District Court said:

"If different evidence is to be offered or a different basis of fares is to be urged before the interstate commission, the state commission should have been given a chance to fix fares on the same evidence and the same basis.

.     .     .     .     .

"Where a railroad seeks the fixing of higher intrastate rates by the interstate commission after failing in such endeavor before a state commission, § 13 (4) does not contemplate that the state commission is to be considered only a way station in a journey to the interstate commission." 146 F. Supp. 195, 201, 202.

---

contribution is to be made, nor any finding from which we may infer how the ICC derived its conclusion that a $77,000 contribution was fair. It is axiomatic that to know whether something is a fair proportionate part of something else, we must be told what the something else is.

On the other hand we cannot agree with the District Court that there was not support in the evidence for the ICC's finding that the prescribed rates would be just and reasonable for the future. The ICC did not rely solely upon the comparison with the similar fares of the Northwestern, for there was ample other evidence in the record to sustain their findings. But the factors which determine the reasonableness of a rate are so different from the factors which determine what is a fair proportionate share of a carrier's total income that a finding of the reasonableness of the rates prescribed does not embrace all the findings necessary to support the exercise of the § 13 (4) power.

This holding in effect restricts the ICC in decisions under § 13 (4) to the identical evidence presented by the railroad to the State Commission. So to restrict the ICC's consideration as to whether intrastate rates work an undue discrimination against interstate commerce might seriously interfere with the Commission's duty to remove the discrimination to protect the exclusive federal domain of interstate commerce. It is contrary to this Court's holding in *Florida* v. *United States,* 282 U. S. 194. There the State Commission had not affirmatively prescribed the existing rates which the ICC increased. It was urged that until the State Commission did so § 13 (4) granted no power to the ICC to prescribe higher rates. This Court rejected this contention, saying "To hold . . . that there can be no adjustment of intrastate rates by the Interstate Commerce Commission so far as may be needed to protect interstate commerce until the State itself has first 'sat in judgment on the issue of the lawfulness of those intrastate rates' would be to impose a limitation not required by the terms of the statute and repugnant to the grant of authority." *Id.,* at 210.

In this case the ICC might more wisely have arranged for joint hearings under § 13 (3) or have deferred action pending an opportunity for the State Commission to consider this evidence. However, nothing in the statute compels either course or denies the ICC the power to determine the question presented by the railroad's petition, whatever may have been the evidence presented before the State Commission. See *North Carolina* v. *United States,* 128 F. Supp. 718, affirmed, 350 U. S. 805; *Illinois* v. *United States,* 101 F. Supp. 36, 47, affirmed, 342 U. S. 930.

Finally, it is argued that the District Court erred in setting aside so much of the ICC order as authorized an increase in the interstate fares to the two Wisconsin points. We believe, however, that these rates are so inter-

woven with and so closely bound to the intrastate rates that a proper disposition of this case reasonably requires that the Commission reconsider them as part of its reconsideration of the entire Chicago suburban commuter service. The only reason why the ICC increased the interstate rates was to make them conform to the increased intrastate rates.

Paragraph 3 of the District Court judgment dated June 14, 1956, is modified to provide that the remand to the ICC shall be for further proceedings not inconsistent with this opinion.

*It is so ordered.*