365 P.2d 65

THERMOID WESTERN CO., Norman Thompson Lumber & Hardware Co., Inc., Utah Poultry & Farmers Cooperative, Utah Lumber Co., and Stokermatic Co., on their own behalf and on behalf of other persons, corporations, and associations similarly situated, Plaintiffs and Appellants,

v.

UNION PACIFIC RAILROAD COMPANY, The Denver and Rio Grande Western Railroad Company, The Western Pacific Company and Bamberger Railroad Company, Defendants and Respondents.

No. 9324.

Supreme Court of Utah.

Sept. 19, 1961.

Pugsley, Hayes, Rampton & Watkiss, Salt Lake City, for appellants.

A. U. Miner, Bryan P. Leverich, S. N. Cornwall, Wood R. Worsley, Salt Lake City, for respondents.

CROCKETT, Justice.

Plaintiff shippers sued defendant railroads to recover alleged overcharges in freight rates. From a rejection of their claims plaintiffs appeal.

The freight charges in question represent a 15% increase in intrastate freight rates in Utah collected by the railroads during 1956, 1957 and 1958 in accordance with an order of the Interstate Commerce Commission which had been made after the Utah Public Service Commission had denied an application for such increase. For brevity we refer to those commissions as I. C. C. and Utah P. S. C.

In 1951 the major railroads of the United States applied to the I. C. C. for a general increase of 15% in interstate freight rates. After an investigative proceeding known as Ex Parte 175 the application was granted. In order to keep their rates comparable the defendant railroads concurrently made application to the Utah P. S. C. for a

similar 15% increase in intrastate freight rates. That commission denied the application on the ground that the evidence produced at the hearing did not "afford the commission sufficient information upon which it can determine whether or not the revenue derived by the railroads from Utah intrastate traffic is inadequate." Instead of pursuing the matter further before the Utah P. S. C. the railroads applied to the I. C. C. to order such an increase in Utah intrastate rates on the theory that they were so low as to place an undue burden on interstate commerce. After a hearing the I. C. C. so found and directed that the Utah P. S. C. allow the increase to be put into effect. The latter commission declined to do so, and a final order allowing such increase was issued by the I. C. C. The defendant railroads filed tariffs with the Utah P. S. C. to make the intrastate rate increases effective June 22, 1956, and thereafter proceeded to collect such charges. The Utah P. S. C. and the Utah Citizens Rate Association instituted action in the U. S. District Court for Utah to set aside the I. C. C. order. A three-judge court rejected the complaint upholding the action of the I. C. C. Plaintiffs then took a direct appeal to the United States Supreme Court[1] which reversed the three-judge court and remanded the cause to the Commission for further proceedings.

The plaintiff shippers contend that the action of the United States Supreme Court in reversing the district court had the effect of declaring that the order of the I. C. C. allowing the rate increases was void; that they are therefore entitled to recover the increased charges which they had paid pursuant to that order; whereas the defendant railroads contend that the order was valid until declared otherwise by that court; that the charges were lawfully collected and that therefore under the rules of both law and equity they are entitled to retain them.

The doctrine out of which the authority of the I. C. C. to regulate railroad rates on operations within the state derives appears to have been first announced in the case of Houston E. & W. T. RR. Co. v. United States.[2] Its rationale is that where a carrier is operating both *inter*state and *intra*state, and rates upon the latter are so low that they do not bear their share of the carrier's expense of operation, this in turn has to be borne by the *inter*state portion of the carrier's business, and thus the *intra*state operation places a burden on *inter*state commerce. In such circumstances it was reasoned that under its prerogative of regulating interstate commerce the I. C. C. had the authority to order the intrastate rates corrected to remove such burden so that interstate trade would not be "left to be destroyed or impeded by the rivalries of local

1. Such an appeal is permitted by the Urgent Deficiencies Act, 28 U.S.C. § 1253.

2. 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341.

governments." [3] The rule was adopted by act of Congress, 49 U.S.C.A. § 13, subsections (3) and (4).

The plaintiffs argue correctly that for the I. C. C. to regulate freight charges within a state is an intrusion into the state's affairs and that such action cannot be justified merely because of disparity or inequality in rates, but only where it is clearly shown that the requirement of the act is met that there is an "undue, unreasonable, or unjust discrimination against, or undue burden on, interstate * * * commerce." [4] The courts consistently acknowledge the merit of this proposition and the importance of respecting the sovereignty of the state and the prerogatives of its functioning authority in such matters. In the case of Palmer v. Commonwealth of Massachusetts [5] the United States Supreme Court said: " * * * in construing legislation this court has disfavored inroads by implication on state authority and resolutely confined restrictions upon the traditional power of states to regulate their local transportation to the plain mandate of Congress." (Citing authorities.) In North Carolina v. United States,[6] the court further observed that "a scrupulous regard for

maintaining the power of the state in this field has caused this Court to require that these Interstate Commerce Commission's orders giving precedence to federal rates must meet a 'high standard of certainty.' " (Citing authorities.)

With the above sentiments we are in hearty accord. But that does not impel a conclusion that the plaintiffs are correct in their charge that the I. C. C.'s order was entirely void because it had no jurisdiction. It is to be remembered that generally where a court or administrative body is dealing with a controversy of the kind it is authorized to adjudicate, and has the parties before it, it has jurisdiction. And jurisdiction does not depend upon the regularity of the exercise of its power or the correctness of decisions made.[7]

As indicated above, as a result of the Houston case and the enactment of its rule into law, it is not to be disputed that under proper circumstances the I. C. C. has the authority to make a corrective order.[8] Giving support to the thought that its original order increasing rates was not an utterly void act but had some semblance of propriety is the fact that it was sustained by

3. See 234 U.S. 342, at page 350, 34 S.Ct. 833, at page 836.
4. 49 U.S.C.A. § 13(4).
5. 308 U.S. 79, 60 S.Ct. 34, 37, 84 L.Ed. 93.

6. 325 U.S. 507, 65 S.Ct. 1260, 1263, 89 L. Ed. 1760, Illinois Central Railroad Co. v. State Public Utilities Commission, 245 U.S. 493, 38 S.Ct. 170, 62 L.Ed. 425.
7. Wasatch Oil Refining Co. v. Wade, 92 Utah 50, 63 P.2d 1070.
8. See footnotes 2 and 4 above.

the federal district court. The manner in which the case was disposed of by the U. S. Supreme Court and proceedings subsequent to its remand are also significant. If that court had regarded the proceeding before the I. C. C. as entirely void, in all likelihood it would have so stated and that would have ended the matter. But it did not do so. Nor does the opinion reflect a view that facts did not *exist* which might justify such an I. C. C. order. From the general language used, "that certain findings of the Commission lacked sufficient support in the evidence," the inadequacy appears to have been that the evidence then presented did not sufficiently demonstrate that the Utah intrastate rates so failed to bear their fair share of the total operational costs as to place the undue burden on interstate commerce requisite to justify intervention by the I. C. C.[9] This, and the remand to the Commission "for further proceedings in conformity with this opinion" does not have the ring of an adjudication that the I. C. C. had no jurisdiction so that its order was void. What it does show is that although the Supreme Court would not sustain the order on the record then before it, it would remand to the I. C. C. to take further proceedings to investigate the facts, and then make such order as is deemed advisable. These subsequent happenings are also important to note: upon the further proceeding and the taking of additional evidence, the I. C. C. again found the Utah intrastate rates so low as to place an undue burden on interstate commerce; it again ordered the increase in freight rates; the order was again attacked by direct appeal to the U. S. Supreme Court; and that court, since the argument of the instant case to this court, has now affirmed the I. C. C. order granting the 15% increase in freight rates.[10]

The plaintiffs have placed considerable reliance on a case cognate to this one brought by another shipper, Structural Steel & Forge Co. v. Union Pacific RR. Co.[11] decided by the Tenth Circuit Court of Appeals wherein the cause was remanded to our state court for trial. Plaintiffs place emphasis on this language: "[The] complaints state a claim [upon] which relief can be granted under the laws of the State of Utah * * *. The * * * reference to the void or vacated order of the Interstate Commerce Commission as a basis for the charges, was not an essential ingredient of the claim for restitution." They argue that the remedy they pursue in the instant case is strictly legal, based on the proposition that the increased rates were illegal under Utah law when they were collected,

9. Public Service Commission of Utah v. United States, 356 U.S. 421, 423, 78 S.Ct. 796, 798, 2 L.Ed.2d 886.

10. Utah Citizens Rate Association et al. v. United States et al., 1961, 365 U.S. 857, 81 S.Ct. 834, 5 L.Ed.2d 857.

11. 269 F.2d 714, 718.

whereas the cases from the federal courts relied upon by defendants, and referred to in this opinion, are proceedings in equity. We see no reason for such distinction and are not persuaded by that argument. We also observe that the Circuit Court did not, as plaintiffs seem to assume, regard the I. C. C. order as void, but referred to it as either "void or vacated." Further, that court plainly and discreetly refrained from presuming to predetermine the matter for the state court by stating in the opinion, " * * * the subject matter of these actions [may be] unsupported by any valid order. In which event, the right to prevail would depend upon traditional notions of equity as in Atlantic Coastline R. Co. v. State of Florida." [12]

■ The Atlantic case bears a close resemblance to our own, and we regard it as providing an appropriate pattern for settlement of the problems here involved. There the plaintiffs were also seeking to recover increases in rates collected under an order of the I. C. C. which had been later set aside by the United States Supreme Court. In the action for restitution that court pointed out the equitable roots and nature of that form of action [13] and that to prevail a claimant must show that the money

was received under such circumstances that it would give offense to equity and good conscience to permit the possessor to retain it.[14] The court further stated that, "The question no longer is whether the law would put him [the railroads] in possession of the money if the transaction were a new one. The question is whether the law will take it out of his [the railroads] possession after he has been able to collect it." [15] It was held that where the railroad had collected the increased charges under the I. C. C. order, the shippers could not recover it back, even though the order had later been set aside.

Another case, the principle of which is applicable here, is United States v. Morgan.[16] That was a suit to recover charges collected pursuant to an order of the Secretary of Agriculture which had been subsequently set aside. The language of the U. S. Supreme Court characterizing its ruling in the Atlantic case, supra, bears directly on the question whether such an order should be regarded as entirely void: "The final result of the litigation was that the railroads were permitted to collect and retain the higher rates for a period during which there was no lawful order of the Commission superseding the state commis-

12. 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451.
13. See 4 Am.Jur. 508, Sec. 20.
14. Compare also Helper State Bank v. Crus, 90 Utah 207, 61 P.2d 318.

15. Atlantic Coast Line case, supra, 295 U.S. at page 310, 55 S.Ct. at page 716.
16. 307 U.S. 183, 195, 59 S.Ct. 795, 802, 83 L.Ed. 1211.

sion rates. * * * But there as here the first administrative order was not a nullity * * * though voidable it could not be ignored without incurring the penalties for disobedience inflicted by the applicable provisions of the statute." [17] In the Morgan case, after extensive proceedings, including three trips to the U. S. Supreme Court, it was held that the charges which had been collected under the order, even though it was later set aside, could not be recovered.

Similarly, in the instant case, after the order of the I. C. C. was issued allowing the intrastate increases, the defendant railroads were collecting the increased charges at least under color of right. They were required to be reported as part of their operating income and have necessarily been integrated into their operations. Inasmuch as the regulatory commissions must allow the railroads to make a reasonable return upon their capital, to require them to reimburse these shippers now would involve difficulties in adjusting income for the year in which they had to repay such charges. And the writer knows of no other alternative than that such expenditures would eventually have to be recouped from the public.

The inequity of compelling the railroads to now repay these funds, then again gather them in from the public, is pointed up by the fact that the plaintiffs themselves have not in fact suffered the losses that may appear on the surface from paying the increased freight rates. The defendants represented to the court at the trial that the plaintiff shippers had passed on these charges to their customers. The plaintiffs did not assert otherwise but practically conceded that such was the fact by stipulating that if their witnesses were called they would testify that, insofar as possible, the increased freight rates were passed on to the public by charging their customers sufficient to cover all costs of doing business including the freight charges for delivery of their products. Thus to allow the shippers to recover would be a windfall benefit to them by giving them compensation again when they had already collected the charge once from the public; and even though the repayment would first be made by the railroad, ultimately it would again come from the public who would thus have to pay the charges twice.

Yet another consideration bearing on the general equitable complexion of this case is the fact that when the railroads filed their tariffs showing the increased freight rates with the Utah P. S. C. they were accepted and filed by that Commission. We here note that we disagree with the railroads' contention that rate therefore became lawful in spite of that Commission's

17. See Atlantic Coast Line case, supra, at page 311 of 295 U.S., at page 717 of 55 S.Ct.

prior denial of their application. They should not be permitted to circumvent the Commission's order in that manner. Nevertheless, the filing of the tariffs was notice to the Commission that such rates would be collected and that is a fact to be taken into account. Neither the Utah P. S. C. nor any of these shippers took any affirmative action to reject the filing of the tariffs or to see that such increased charges were impounded for the purpose of protecting the public.

The latter procedure is a point of distinction between the instant situation and the case relied upon heavily by the plaintiffs, Chicago M. St. P. RR. v. State of Illinois.[18] There as here, the state commission had denied a rate increase on intrastate rates, and the I. C. C. had granted it. A three-judge Federal District Court set aside the I. C. C. order. However, the court entered an order permitting the railroads to collect the higher rates during the pendency of their appeal to the Supreme Court of the United States, but required that the funds so collected be impounded. The U. S. Supreme Court held the increase order invalid and remanded to the I. C. C. for further proceedings. The shippers thereupon applied to the district court for return of the overcharges, which was granted, and the action was upheld by the United States Supreme Court. The distinction between that situation, where the railroads were merely required to return funds collected and held pending determination of the validity of the order, and the one here, where the money has been collected and treated as operating income and used in the railroads' operations, is obvious. If the funds here had been impounded, the equities in this action would have been greatly different, and restitution could have been ordered without the complications which here exist.

In accordance with the principles herein discussed, upon our survey of the record we do not view it as requiring reversal of the judgment of the trial court. Affirmed. The parties to bear their own costs.

McDONOUGH, J., concurs.

HENRIOD, Justice.

I concur in the result, but not in some of the reasoning of the main opinion, particularly that relating to difference in result that might eventuate depending on impoundage of the funds; that concerning the advisability, wisdom or impellents causing the P. S. C. or the litigants to pursue their individual courses; and that concerning absorption of costs by any particular segment of the community. Irrespective of the eminence of the jurists on the dissent of the Atlantic Coast Line case, I feel con-

18. 355 U.S. 300, 78 S.Ct. 304, 2 L.Ed.2d 292, on Supplemental Proceeding, 356 U.S. 906, 78 S.Ct. 665, 2 L.Ed.2d 573.

strained to go along in the main with the observations of the also eminent members of the majority.

CALLISTER, Justice (dissenting).

I dissent. Although efforts have been made by appellants to distinguish this case from Atlantic Coast Line R. Co. v. State of Florida,[1] I fail to see any basic difference.

In the Atlantic Coast Line case the facts are parallel to those in this case. There, as here, the I. C. C.'s order increasing intrastate rates was upset by the U. S. Supreme Court and, in both instances, the carriers exacted the increased rates by virtue of the invalid order. There, as here, the I. C. C. held a second hearing and entered a new order to the same effect as the first. There, as here, the U. S. Supreme Court upheld the second order of the I. C. C.

The majority of the court in the Atlantic Coast Line case (it was a 5–4 decision) placed great importance upon the fact that the second I. C. C. order was valid, thus determining that the first order was factually reasonable—an element of which the court could take advantage under the equitable nature of the action. The majority concluded that restitution is an equitable action and that the shippers had failed to sustain the burden of proving that

it would be inequitable to permit the carrier to retain the alleged overcharges.

The majority opinion in the instant case applies equitable principles and holds that it would be inequitable, under the circumstances, to require the carriers to make restitution where the moneys had been collected as operating income and integrated into their operations. The opinion holds that the result might be different had the moneys been impounded.

I fail to understand what difference it makes whether the funds collected are impounded or not. The shippers are either entitled to restitution or they are not, and the use or disposition of the funds by the carriers should have no bearing thereon.

The majority opinion criticizes the P. S. C. for failing to reject the filing of the tariffs set by the I. C. C.'s first order and failing to order that the increased charges be impounded. It is submitted that the P. S. C. had no alternative but to accept the filing and certainly had no authority to require the impounding of the increased charges.

I find the minority view in the Atlantic Coast Line case to be persuasive. Its adoption would render moot the questions relating to the impounding or not of the funds, whether the I. C. C.'s first order was void or voidable and whether the second order

1. 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451.

of the I. C. C. is valid or not. Mr. Justice Roberts, speaking for the minority, stated:

"The case is not to be decided according to the character ascribed to the first order of the Commission. Whether called void or voidable, the order gave the railroad no right to collect the sums exacted. If, as must be conceded, the carrier took, under and by force of that order, money to which it was not in law entitled, the conclusion necessarily follows that it must restore what was so taken."

WADE, C. J., concurs in the dissenting opinion of CALLISTER, J.