**MARTIN MARIETTA CORPORATION**

v.

**UNITED STATES of America et al.**

Civ. No. 72–1077–HM.

United States District Court,
D. Maryland.

Jan. 21, 1975.

Benjamin C. Howard, Baltimore, Md., and Samuel P. Delisi, Pittsburgh, Pa., for plaintiff.

Thomas E. Kauper, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C.; George Beall, U. S. Atty., Robert Rohrbaugh, Asst. U. S. Atty., for defendant United States.

Fritz R. Kahn, Gen. Counsel, James F. Tao, Atty., Peter Fitzpatrick, Atty., for I.C.C., Washington, D. C.

John H. Lewin, Sr., Baltimore, Md., and Hugh B. Cox, Charles A. Horsky, Michael Boudin, Washington, D. C., for intervening defendants Southern Railway Company, and others.

Before WINTER, Circuit Judge, and HARVEY and MURRAY, District Judges.

HERBERT F. MURRAY, District Judge.

I

*Facts*

Plaintiff Martin Marietta Corporation (or its predecessor Southern Cement Co.) has since 1962 operated a cement plant in Magnolia, Georgia, within the corporate limits of the city of Atlanta. The plant is unusual in that its raw materials—limestone and marble quarried into untrimmed boulders, which plaintiff terms "cement stone"—are shipped to the plant from some distance away, primarily from Rome and Tate, both in Georgia. The rates applicable to the rail shipment of this stone were negotiated between the railroads and the cement manufacturer prior to 1964; they were set at 75¢ per ton, subject to various conditions concerning such factors as minimum tonnage. These rates were in effect until 1969.

In 1968, the Interstate Commerce Commission (ICC) issued an order authorizing increases in interstate railroad freight rates. Ex Parte 259, Increased Freight Rates, 1968, 332 I.C.C. 590, 714. As applicable to commodities comparable to plaintiff's cement stone, which the ICC classifies as "aggregate," the new rates imposed a 15¢ increase. Since Ex Parte 259 raised only interstate rates, the railroads next petitioned state commissions for increases in intrastate rates. One such commission, the Georgia Public Service Commission (hereinafter referred to as the PSC) on August 20, 1969 ruled on the railroads' request. The PSC granted increases within Georgia to the level of the new ICC rates on all but a few commodities. One of the exceptions was aggregate; the PSC's new rate would have raised plaintiff's cost per ton to 79¢, as opposed to the 90¢ per ton sought by the railroads.

Pursuant to 49 U.S.C. § 13(4), the railroads then returned to the ICC, seeking an order raising the lower Georgia rates to the interstate level. I.C.C. Docket Numbers 35190, 35191. On June 22 and 23, 1970, an examiner conducted hearings on these petitions, in which the plaintiff participated. The examiner issued a report on April 8, 1971, which Review Board No. 4 of the ICC adopted, with one alteration, on February 17, 1972. The report granted the railroads' petition insofar as it requested that the plaintiff's cost be raised to 90¢ per ton, but denied it insofar as it requested (in No. 35191) a change in intrastate *scale*, which would have resulted in a cost to plaintiff of $1.36 per ton. The ICC Order adopting the report also delayed implementation of the new rates because of Price Commission Regulations.

On April 19, 1972, plaintiff sought reconsideration of the Order as it related to its particular situation. On September 14, 1972, a further ICC Order by Appellate Div. 2 denied reconsideration

and set October 30, 1972 as the effective date for the increases.

This action was brought by plaintiff on October 19, 1972; an Order of this Court of the same date restrained the implementation of the rates. That Order in turn was vacated on October 27, 1972, on condition that the railroads keep an accounting of revenues collected because of the new rates. Intervention by the railroads was permitted by Order of November 3, 1972. A three-judge panel was designated by Chief Judge Haynsworth on November 10, 1972, and heard oral argument on May 30, 1974.

## II

### Plaintiff's "Jurisdiction" Argument

Plaintiff argues that the ICC was without jurisdiction to order the intrastate rate increase, because interstate commerce was not affected. This argument need not detain us long.

The argument is grounded on an assertion that plaintiff's operation is unique in that no other cement plant in the South is located away from the sources of its raw materials. This uniqueness is said to be important because it shows the absence of any competitors who would be discriminated against by having to pay the higher interstate rates while plaintiff pays the lower intrastate rate. Even if plaintiff's operation is unique, that fact would not affect the power of the ICC to order a change in the intrastate rates.

■ 49 U.S.C. § 13(4) reads in relevant part:

Whenever . . . the Commission . . . finds that any [intrastate] rate . . . causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or *any undue, unreasonable, or unjust discrimination against, or undue burden*

*on, interstate or foreign commerce* . . . it shall prescribe the rate . . . to be charged . . . . [emphasis added.]

The statute makes clear that the ICC may direct changes on the sole ground that the carrier's costs justify higher intrastate rates.

Any doubts concerning the existence of this alternate ground for ICC intervention were removed by the Supreme Court as early as 1922, in Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co., 257 U.S. 563, 42 S.Ct. 232, 72 L. Ed. 434. The proposition is beyond doubt now. *See* Public Service Commission of Utah v. United States, 356 U.S. 421, 431, 78 S.Ct. 796, 802, 2 L.Ed.2d 886 (1958) (Frankfurter, J., dissenting).

Plaintiff has cited three ICC decisions for the proposition that the Commission lacks the power to raise intrastate rates in the absence of interstate competition with the intrastate shipper. The cases do not stand for that proposition. Rather they are cases where in the exercise of its administrative authority the ICC concluded that intrastate rates did not burden interstate commerce in *any* manner. They do not rest on any purported lack of "jurisdiction" or power.

■ Thus, even if only one shipper with an operation unique in the nation enjoys a particular freight rate, the ICC may lawfully conclude that the rate burdens the carrier's interstate operation, and may authorize an increase.

## III

### The Substantiality of the Evidence

Plaintiff's second argument is more difficult. Without describing what precise standards should be applied, Martin Marietta argues that the record before the ICC does not reveal sufficient evidence to support (1) the finding that intrastate transportation conditions are not more favorable than interstate con-

ditions or (2) the finding that plaintiff's present 79¢ per ton rate does not pay its fair share of the railroads' revenue needs.

The difficulty lies in determining what sort of evidence the ICC may or must weigh in a proceeding of this type, and the standard of review that should be applied by the courts.

In two 1958 cases, Chicago, M., St. P. and P. R. Co. v. State of Illinois, 355 U. S. 300, 78 S.Ct. 304, 2 L.Ed.2d 292, and Public Service Commission of Utah v. United States, *supra,* the Supreme Court set out standards, holding that the ICC must base its decision on evidence showing the net unprofitability of intrastate operations taken as a whole (*Chicago* case) with an allocation separating such operation from the road's interstate accounting (*Utah* case). These decisions were specifically disapproved in the 1958 amendments to Section 13(4), one of which inserted the following parenthesis:

> Whenever . . . the Commission . . . finds that any such rate . . . causes any undue burden on interstate or foreign commerce (which the Commission may find without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier, or group or groups of carriers wholly within any state) . . .

*See* 2 U.S.Code Cong. & Admin.News, 85th Congress (1958), at 3484–3485.

■ The result of this amendment is to permit the ICC to base its intrastate rate findings on evidence relating solely to the overall revenue needs of the carriers. *See, e. g.,* State of North Carolina ex rel. North Carolina Utilities Commission v. I. C. C., 347 F.Supp. 103 (E. D.N.C.1972), aff'd, 410 U.S. 919, 93 S.Ct. 1362, 35 L.Ed.2d 582 (1973); Public Service Commission of West Virginia v. United States, 365 F.Supp. 6 (S.D.W. Va.1973).

The record here does include findings on that generalized level, concerning the overall revenue needs of the railroads, and the substantial identity between their interstate and intrastate facilities, equipment and personnel. These findings, viewed by themselves, are clearly supported by substantial evidence, both in Ex parte 259, *see* Examiner's Report, p. 51; and in the present proceeding as is demonstrated by the I.C.C. Order of February 17, 1972, at page 2, and by Exhibits 8 and 10 to the Transcript. *See* Public Service Commission of Utah, *supra,* 356 U.S. at 448 (Frankfurter, J., dissenting); *North Carolina ex rel. N.C. Utilities Commission, supra,* 347 F.Supp. at 111.

However, the hearing examiner went further and considered evidence relating specifically to the shipments of cement stone. Since he did weigh this evidence, the reviewing court cannot do less, within the limits always imposed on judicial review of agency action. *See* Arkansas Grain Corp. v. United States, 263 F.Supp. 480 (E.D.Ark.1966), aff'd sub nom., Aluminum Co. of America v. United States, 387 U.S. 573, 87 S.Ct. 2069, 18 L.Ed.2d 965 (1967).

■■ Ordinarily, of course, the ICC decision will be upheld if it is supported by "substantial" evidence. *See, e.g.,* Kent Freight Lines, Inc. v. United States, 341 F.Supp. 787, 789–790 (D. Md.1972); Tidewater Express Lines, Inc. v. United States, 278 F.Supp. 561 (D.Md.1968). However, where the hearing examiner considers evidence presented by protestants seeking *exemption* from a general rate, a different standard appears to apply. Justice Frankfurter's dissent in Public Service Commission of Utah, *supra,* 356 U.S. at 448–449, 78 S. Ct. at 810–811, which is entitled to unusual deference because of Congress' disapproval of the majority position, notes,

> When a § 13 proceeding follows regulation of rates on comparable interstate traffic, furthermore, evidence

introduced in the interstate proceedings, whether they are general revenue proceedings or directed to specific rates, will, to a greater or less extent, also bear on conditions surrounding the movement of intrastate traffic, and it may not be unreasonable for the Commission to assume, *in the absence of persuasive evidence to the contrary,* that the conclusions it has drawn from such evidence about general conditions are equally applicable to a particular State. As was stated in King v. United States, 344 U.S. 254, 272, 73 S.Ct. 259, 269, 97 L.Ed. 301, "In the absence of any showing that it is not applicable to Florida, the evidence which forms the basis of the Commission's nationwide order becomes the natural basis for its Florida order." . . . If general orders are to be possible at all, and § 13(4) necessarily implies them, the Commission must be able to proceed on evidence typical of general conditions, *see* Georgia Public Service Comm'n v. United States, 283 U.S. 765, 774, 51 S.Ct. 619, 622, 75 L.Ed. 1397, *making provision as it did in the present case for the reexamination of specific rates claimed not to fall within the findings.* [Emphasis added.]

Since the burden before the ICC is on the party seeking to justify an exemption, obviously a stronger presumption will attach, in judicial proceedings, to an ICC conclusion that no exemption is merited. The applicable standard would appear to be similar to the one set out by the Supreme Court in In re Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968), a Federal Power Commission case:

A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake "the heavy burden of making a convincing showing that it is invalid because it is unjust

and unreasonable in its consequences." FPC v. Hope Natural Gas Co., 320 U. S. [591,] 602, 64 S.Ct. [281,] 288 [88 L.Ed. 333] (1944). We are not obliged to examine each detail of the Commission's decision; if the "total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." Ibid.

With this standard in mind, we turn to the findings made by the examiner, and the evidence on which he relied.

The report submitted by the examiner includes, at page 56, the following passage:

The rates from Tate and Rome to the Magnolia plant of Southern Cement were arrived at by negotiation and have remained unchanged since they were established in 1962 and 1964, respectively, save for the 5 percent increase authorized by the Georgia commission. Considering that these rates were exempted from the X-223 and X-256 increases, and that the increase here sought is the same as was applied to the rates of many interstate shippers who incurred both of those increases, the protestants Southern Cement and LBI Quarries realistically have little to complain about. The evidence is incontestable that rail costs have soared since these rates were established. No convincing evidence has been presented on this record why Southern Cement and/or LBI Quarries should not be required to bear their fair share in partial relief of the railroads' cost-profit squeeze.

Having carefully considered the evidence of respondents and of each of the protestants, and in light of the disposition of the increase sought in No. 35191, in the discussion which immediately follows, it is the examiner's recommendation that the increase in the rates on aggregates, sought in No. 35190, be granted.

The evidence referred to is set out at pages 30–36 of the report, where the examiner noted:

(1) that plaintiff's proofs tended to show that the cement stone operations were simple and undemanding on the railroads—the examiner also partially discounted the railroads' rebuttal;

(2) that plaintiff attempted to show that the railroads were making more money from the cement stone shipments than they had expected; and

(3) that the differential between the 90¢ rate that the railroads were seeking for the stone and the scale rate of $1.36 was still a greater differential than between the two old rates of 75¢ and $1.-16.

The examiner's finding also reflects his awareness that the denial of the increase in scale rates in No. 35191 left the plaintiff with much of the benefit of his bargain.

█ In sum, the finding shows that the examiner did not find "persuasive" the evidence offered by the plaintiff to prove the inapplicability of the general rate. The examiner's conclusion, as adopted by the ICC, that the intrastate rates were discriminatory is supported by substantial evidence, and the Commission's order accordingly will be affirmed.

Finally, the Court thinks it proper to point out that this is a discrimination and not a rate case. Therefore, if the railroads or the shipper wish to seek an increase or decrease in a particular rate, they have a continuing right to institute such a proceeding before the Commission.

For the reasons herein stated, it is this 1st day of January, 1975, by the United States District Court for the District of Maryland,

Ordered:

that plaintiff's complaint be, and the same hereby is, dismissed.