Argued February 7, affirmed as modified June 13, petition for rehearing denied July 6, 1962

## PORTLAND TRACTION COMPANY *v.* HILL, PUBLIC UTILITY COMMISSIONER

### 372 P. 2d 501

*Peter S. Herman,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Robert Y. Thornton, Attorney General, and Lloyd G. Hammel, Assistant Attorney General, Salem.

*Grant T. Anderson,* Portland, argued the cause for respondent. On the brief were King, Miller, Anderson, Nash & Yerke, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, SLOAN, O'CONNELL, GOODWIN and LUSK, Justices.

ROSSMAN, J.

This is an appeal by the defendant, the Public Utility Commissioner of this state, from a decree which the Circuit Court for Marion County entered in favor of the plaintiff, Portland Traction Company, in a suit instituted by it which prayed that the defendant (the commissioner) be enjoined from requiring the plaintiff "to furnish any passenger service over any part of its lines of railroad for any period of time as provided in said Order No. 35782 or otherwise." Order 35782 is supplementary to two other orders which the commissioner also issued; one is 34218 and the other is 35219.

Order 35782 was entered January 25, 1958. On that day the Portland Traction Company (hereafter termed the company) abandoned all of its passenger service. Order 35782 directed it to continue its pas-

senger service as detailed in Orders 34218 and 35219. Order 34218 was entered February 17, 1956, and directed the company to amplify its passenger service with the more frequent schedules which that order set forth. Order 35219 which was entered by the commissioner March 18, 1957, ordered the company to institute shuttle bus service between (1) its east Portland station, beyond which its cars could not go after March 1957 due to loss of trackage rights and (2) its west side terminal in Portland's downtown west side business district.

The immediate objective of this suit is to secure a decree holding invalid Order 35782 which directed the company to continue to operate its passenger service. The ultimate objective of the suit is to enable the company to abandon its interurban passenger service. Since the company ceased the operation of all of its passenger cars on January 25, 1958, the same day that the commissioner entered Order 35782, the real purpose of the suit is to recognize as valid the company's abandonment of its passenger service. The issue can be narrowed still further; December 26, 1958, the commissioner "rescinded" Orders 34218, 35219 and 35782 through the entry of Order 36459. The words of the latter were: "Ordered that P.U.C. Oregon Orders 34218, 35219 and 35782 * * * relating to the rendition of interurban passenger service by Portland Traction Company are rescinded effective this date." Thus, since Order 35782 as well as the two supplementary orders were rescinded December 26, 1958, the sole issue as to 35782 is the effect which must be recognized in it between the date of its entry on January 25, 1958, and December 26, 1958, when the commissioner entered his order "rescinded effective this date." We add that the prayer of the complaint in

this suit seeks an order holding invalid only Order 35782.

This is the second appearance of this cause before this court. It came here the first time, *Portland Traction Company v. Hill,* 222 Or 636, 352 P2d 553, 353 P2d 838, shortly after the commissioner had "rescinded effective this date" the three above mentioned orders and the circuit court had thereupon concluded that this suit, which challenged their validity, had become moot. Our decision held that the words "effective this date" had a prospective effect only and that they did not of themselves affect any rights or liabilities that had accrued up to that day. The decision ruled that those words did not rescind the three orders from the day when each of them was entered (No. 35782 on January 25, 1958; No. 35219 on March 18, 1957; No. 34218 on February 17, 1956) but only from December 26, 1958, when the order was entered (36459) which undertook to rescind them.

Since *Morgan v. Portland Traction Co.,* 222 Or 614, 331 P2d 344, which was also concerned with the validity of Order 35782 and its two companions, ruled that a suit of the very kind that is now before us is the exclusive means of testing the validity of orders of that kind, we held that the traction company was entitled to maintain this suit for the purpose of determining the validity of Order 34782, during the period of January 25, 1958, when it was entered, to December 26, 1958, when the order of rescission ("effective this date") was announced. The decision took note of the threats that had been made of suits for penalties and treble damages based upon the company's purported violation of the order. We, therefore, ruled that the suit had not become moot and remanded it to the circuit court.

For the sake of achieving greater clarity we will retrace a few steps so as to develop better the sequence of events. February 17, 1956, while the company was operating its freight and passenger service the commissioner entered Order No. 34218 which directed the company to amplify its passenger service by operating more cars and more frequent schedules. The commissioner believed that superior service would cultivate increased patronage for the passenger service. The company complied with the order. By March 18, 1957, as we will later explain, the company lost the right it had enjoyed for many years of running its passenger cars across the Willamette River upon Hawthorne Bridge in Portland from the east side where it entered the city into the west side central business district where it maintained a station. At about the same time it lost its city franchise which had enabled it to maintain car rails in the city's west side business streets. At that juncture the commissioner entered Order 35219 which directed the company to institute shuttle bus service between the east end of the Hawthorne Bridge and the company's west side station. That order was entered March 18, 1957. By November 25, 1957, the company's car riders were less than one-third their number in 1952, and thereupon the company gave notice to the commissioner and to the public, as permitted by ORS 760.215, that on December 15, 1957, it would abandon its passenger service. The commissioner directed the company to suspend its notice of abandonment and in the meantime held a series of hearings concerning the projected abandonment and the need for the company's service. In the course of these hearings testimony was taken which, as transcribed, constitutes five volumes and covers 1,050 typewritten pages. It is accompanied with numerous ex-

hibits of a statistical nature. The hearings concluded December 30, 1957. January 25, 1958, the commissioner entered Order 35782 which, as we have said, directed the company to continue its passenger service. On the same day the company abandoned all of its passenger service. Since then it has operated no passenger cars. January 28, 1958, the circuit court, upon the commissioner's ex parte demand, entered an order of peremptory mandamus commanding the company to comply with the various orders aforementioned issued by the commissioner. That proceeding resulted in *Morgan v. Portland Traction Company*, 222 Or 614, 331 P2d 344, which held that the validity of Order No. 35782 could not be questioned in that proceeding (mandamus) and could be challenged only in a suit of the type that is now before us, that is, one instituted in Marion County under ORS 756.580 et seq. and 760.580 et seq.

April 25, 1958, eight months before this court announced the Morgan decision, the company filed this suit (the one at bar) in the Circuit Court for Marion County under ORS 756.580 et seq. and 760.580 et seq., being the very kind of a suit which the Morgan decision held was essential to challenge Order 35782. November 17, 1958, the commissioner filed his amended answer in this suit. It submitted that Order 35782 was reasonable and not confiscatory. Then testimony was taken and at its close, December 15, 1958, the court, as required by ORS 756.600, remanded the matter to the commissioner to enable him, among other matters, to make findings upon the testimony which was taken by the court. ORS 756.600 (2) provides that when a cause has been remanded to the commissioner he "may alter, modify, amend or rescind his order." December 26, 1958, the commissioner

entered Order 36459 which referred to Orders 34218, 35219, and 35782, and then declared, as we have noted, that they "are rescinded effective this date." Thereupon, the circuit court, under a belief that the three orders had become moot, dismissed the suit, that is, this suit. We reversed the order of dismissal and remanded the cause to the circuit court which stated in a memorandum opinion:

> "It is the opinion of the Court that to require the plaintiff to provide the services directed in Order No. 35782 under the operation circumstances herein above related, is to deprive the company of its property without due process of law * * * and to deny to the plaintiff the equal protection of the laws * * *. There does not appear to be any schedule of rates or of services which would reasonably compensate plaintiff for its property dedicated to the public use, and that said Order No. 35782 is not reasonable. * * *"

The decree that was entered was in harmony with the statements made in the memorandum opinion which we just quoted. The date of its entry, December 20, 1960, was almost three years after the company had ceased to operate passenger service.

From the decree just mentioned the commissioner appealed; accordingly, the cause is before us again. When the commissioner entered Order 36459 which, referring to Orders 34218, 35219 and 35782, stated "they are rescinded effective this date" he entered nothing which he entitled findings of fact. The order gave a review of the proceedings that preceded its entry. It noted, for instance, that the company had twice previously, unsuccessfully, given similar notice of intention to abandon passenger service and expressed the commissioner's disappointment over the outcome of judicial proceedings which had not sup-

ported his orders to the extent that he desired. It questioned whether any orders given for the rehabilitation of the suburban service at that time could restore it. The Order took note of the bus transportation service that was available to those who previously had patronized the interurban railroad and after doubting its adequacy shortly mentioned that "Inter-City Busses had obtained additional equipment and increased the frequency of its schedules traversing the Company's service area by something in excess of 33 1/3%, all routes considered." It added that Inter-City Busses had materially increased its patronage and amplified its equipment after the company had ceased its passenger service. Order 35782, being the one under review, expressed the conviction that much of the company's loss of patronage was due to its own desires and designs. It even attributed fault to the company in not having secured the right to maintain rails in the Hawthorne Bridge and the city streets.

The foregoing gives us the sequence of events. We will now mention additional facts.

The company for many years operated two short lines of railroad which rendered freight and passenger service between Portland and points south and east of it. Since its freight service is of collateral interest only, we will confine our description of the company's operations largely to its passenger business. One segment of the railroad ran south of Portland for a distance of about 14 miles where it terminated at a point one mile beyond Oregon City. Upon it the company rendered passenger service to 25 intermediate points between Portland and Oregon City. The other segment ran for 24 miles in a direction from Portland which may be termed easterly. Passenger service which was rendered upon it for 13.10 miles terminated in a com-

munity known as Bellrose. It served 24 intermediate points. The passenger service was rendered by cars of the kind commonly known as trolley or interurban cars. Freight trains also operated upon both segments of the company's line.

Order 35219 was entered March 18, 1957, after the county commissioners of Multnomah County (Portland), incidental to the closing to rail traffic of Hawthorne Bridge in Portland, had torn up the rails which the company had used in running its cars into the west side (downtown) section of Portland. The company's cars, before reaching Hawthorne Bridge, ran upon the east bank of the Willamette River for a considerable distance and then through an industrial area which brought them to southeast Front and Hawthorne streets on the east side of Portland where the company maintained a station. A hundred feet or so to the west was the east approach to the Hawthorne Bridge. The latter crosses the Willamette River to the west side of Portland. The car rails used by the company after crossing the river upon Hawthorne Bridge continued on for a distance of a mile or so to southwest First and Washington streets in downtown Portland where the company maintained a waiting room. Southwest First and Washington streets was the west side terminal of the company's line.

When the rails on the bridge were torn up the company's cars could no longer cross the bridge and reach the west side terminal. Services thereupon ended at southeast Front and Hawthorne streets. The inability of the passengers to cross the river in the company's cars and proceed to the downtown part of the city was very unsatisfactory to them. About the same time the franchise which enabled the company

to maintain tracks in the city streets and operate its cars from the west end of the Hawthorne Bridge to southwest First and Washington streets expired and was not renewed by the city council of Portland. The county commissioners tore up the company's tracks upon Hawthorne Bridge incidental to extensive reconstruction of the bridge and because of a belief that the operation of electric street cars upon the bridge would materially decrease the volume of traffic which the bridge could accommodate. In the meantime the company's terminal at southwest First and Washington streets was condemned and thereupon destroyed by the state incidental to the construction of Harbor Drive and expanded approaches to the west end of Morrison Bridge. Order 35219, which we have mentioned, directed the company to institute shuttle bus service to its stations on the east and west sides of Portland. The company complied with Order 34218 and after contesting the validity of Order 35219 complied in the main with it. The city and county officials were firmly opposed to any rails in the deck of Hawthorne Bridge and in the pavement of the city streets. They believed that the operation of trolley cars upon the bridge and in the streets hindered the flow of traffic.

ORS 760.205—760.255 (Oregon Laws 1957, chapter 415, page 576) prescribes the circumstances under which railroads may reduce or abandon their passenger service and also the extent of supervision which the commissioner may exercise over them as they reduce or abandon their service.

Section 3 of the statute just cited provides:

"(2) 'Reduction of Passenger Transportation service' means:

"(a) Any discontinuance or reduction in the fre-

quency of passenger trains per day in either direction over a particular railroad route."

Section 3 of the act states:

"A railroad shall give 20 days' notice, unless exempted by the commissioner under section 7 of this Act, to the commissioner and to the public, of any proposed reduction of passenger transportation service to any point or place in this state before such proposed reduction shall become effective. Such notice shall explicitly indicate each proposed reduction in passenger transportation service and shall set forth the reasons for such reductions."

It is clear that the company gave the required notice. It was given November 25, 1957, and stated that passenger service would cease December 15, 1957. There is, in fact, no controversy upon that subject. The notice was suspended by the commissioner's Order on December 3, 1957, while he conducted the hearings which we have mentioned. January 25, 1958, the commissioner entered Order 35782, which directed the company to continue its passenger service, and thereupon it abandoned the latter.

■ It is evident that the commissioner was aware of the principles of law that govern proceedings for the abandonment of passenger train service even in cases that are unaffected by legislation such as ORS 760.-205—760.255, supra. We observe, for example, that in Order 35782 which we just mentioned, the commissioner, in referring to an application for the abandonment of its passenger service which the company made in a year prior to the enactment of ORS 760.205—760.255, supra, stated:

"In November 1952 the Company filed an application with the Commissioner for authority to abandon passenger service on its interurban lines. Public hearings were held and, on February 10,

1953, the Commissioner by his Order 31858 denied the application, noting that public convenience and necessity required continued operation of the service \* \* \*."

Thus, the commissioner recognized that in order to deny an application for the abandonment of passenger service, public convenience and necessity must require continuance of the service. See Railroad Service Discontinuances, 43 Minn. L Rev. 275.

Section 8 of the 1957 statute provides:

"(1) Whenever any railroad files with the commissioner any schedule of passenger transportation service the effect of which is to reduce an existing passenger transportation service, the commissioner may, either upon written complaint or upon his own initiative after reasonable notice to the railroad, conduct a hearing to determine the propriety and adequacy of such service.

"(2) At the hearing the burden of showing that the proposed passenger transportation service is just, reasonable and adequate is upon the railroad proposing the reduction."

The section of our laws just quoted requires that "just, reasonable and adequate" passenger service must remain after the reduction has been made which the applicant railroad proposes. The draftsman of our act chose the words "just, reasonable and adequate" rather than the more commonly employed phrase "public convenience and necessity" which the commissioner included in Order 35782. Section 8 (1) of the act authorizes the commissioner to "conduct a hearing to determine the propriety and adequacy of such service." The commissioner, as we have seen, conducted an extensive hearing of that character. A part of the facts that he learned are disclosed when

one takes note of the averments of the complaint that are admitted in the answer filed by the commissioner. We believe that those facts have a bearing upon the issue as to whether or not the operation of the company's passenger cars was needed in the latter part of 1957 and the early part of 1958 to provide "just, reasonable and adequate" transportation service for the area served by the company. The facts to which we will now resort indicate whether or not (1) there was sufficient patronage in the area served by the company's cars to pay at least the out-of-pocket expenses of rendering the service; (2) the patronage was on the decline and offered no prospects of increasing; and (3) other suitable transportation service at equally low prices and operating with equal celerity was available. If the facts established by the pleadings do not settle all of the above issues we will then turn to the evidence.

Paragraphs of the complaint which the answer admits allege:

"During the past several years, and up until the abandonment of all passenger operations by PTCO as hereinafter alleged, PTCO experienced a steady decline in passengers carried upon its lines of railroad. The total of all passengers carried each year from the year 1952 through the year 1957 is as follows:

| | |
|---|---|
| 1952 | 1,551,694 |
| 1953 | 1,439,105 |
| 1954 | 1,309,934 |
| 1955 | 1,097,073 |
| 1956 | 952,663 |
| 1957 | 447,448" |

We have noticed that it was in 1956 that the commissioner required the company to run more frequent schedules under a belief that enhanced service would

increase patronage. We have also taken note of the fact that in or about the early part of 1957 the company lost the right to run cars from east Front and Hawthorne streets across the Hawthorne Bridge into downtown Portland. One sees from the statistics just quoted that from 1952 through 1957 the company's passengers declined in number from 1,551,094 to 447,-448, even though the company was providing daily the more frequent service required by Order 34218.

Another paragraph of the complaint, which is admitted by the answer, sets forth:

"PTCO's out-of-pocket costs during the year 1955 from passenger operations under the schedules of passenger service in effect prior to August 20, and under the reduced schedules of passenger service in effect during the remainder of said year, exceeded total passenger revenues received during said year by more than $41,000. Contrary to the prediction of the Public Utility Commissioner that increased schedules would provide increased passenger revenues, such revenues further declined during the year 1956 and PTCO's out-of-pocket costs from passenger operations under the schedules of service which were in effect until March 16, and under the schedules of service prescribed by the aforesaid Order No. 34218 and in effect on and after March 16, exceeded total passenger revenues received during said year by more than $59,000. Passenger revenues further declined during the year 1957, and PTCO's out-of-pocket costs from passenger operations under the schedules of service prescribed by the aforementioned Order No. 34218, including shuttle-bus service on and after October 21, 1957, between said Southeast First and Hawthorne streets and the downtown area on the west side of the Willamette River, as prescribed by the aforesaid Order No. 35219, exceeded total passenger revenues received during said year by more than $154,000."

Thus, the commissioner admitted that the company carried its passengers at an ever-increasing financial loss. The out-of-pocket loss amounted, in 1957, to $154,000. A witness, after examining the records of the company testified:

"* * * in examination of the current financial statements indicating, as I pointed out earlier today, the current operating expenses of the passenger service are about five times the revenues being received."

No one who participated in the proceeding suggested any combination of passenger rates and schedules which would enable income to equal out-of-pocket expenses. Seemingly, the cars were destined to run virtually empty at an ever increasing annual financial loss. The record indicates that in the last year of operation the company suffered a small loss in its total operations (intrastate and interstate).

Evidence indicates that in recent years the company sustained an ever greater financial loss in rendering its passenger service. In those years wages and the cost of materials constantly increased. The increase was sufficient so that although the number of passengers expanded the company's net loss also expanded. For example, in 1950 the company carried 1,403,641 passengers but incurred a net loss of $98,316. In 1951 it carried 1,436,772 passengers but met with a net loss of $121,150. In 1952 it carried 1,491,085 passengers but incurred a net loss of $159,000. In that three year period the company gained 87,000 passengers but its net loss expanded from $98,316 to $159,000. An observation was made in the course of the hearing that the company had not sought to diminish its losses through applying for increased passenger fares; but one of its officials stated: "If

we increased our rates we would lose a certain amount of traffic," and added: "I have to admit that we are 5 cents higher in one or two points along there" than one of its competitors.

We noticed that when the company could no longer run its cars across the Hawthorne Bridge and into the downtown section of Portland the number of its passengers declined drastically. The record indicates that the county commissioners refused to permit the laying of track upon Hawthorne Bridge. One of the commissioners of the city of Portland who testified swore that he was positively opposed to the operation of trolley cars upon the downtown streets of the city. A witness who served the interurban railway industry in various parts of the country testified that when passengers are required to transfer from one carrier to another before reaching their destination the carrier has, in that incident, a severe handicap in competing with others. The record indicates that the transfer from the company's electric cars to motor busses adds five minutes to the time required in reaching downtown Portland and that the company's passengers reach their destination five minutes later than those who travel by bus.

After the company's cars were no longer able to cross the Hawthorne Bridge and run to the company's west side station the number of its passengers became very small. During the course of the trial the commissioner's counsel admitted the following averment which is a part of the complaint:

"The total of all revenue passengers being carried by PTCO at the time of abandonment of passenger operations hereinafter alleged, and for more than one year prior thereto, averaged less than one passenger per train mile * * *."

The area served by the company is criss-crossed by a network of roads and streets. The numerous recurring street intersections have prevented the company from developing fast schedules and of thereby offering superior service to the area. Since streets and roads are frequent, many who live in the area drive their own automobiles and do not patronize the company's interurban cars. The numerous roads and streets, some of which parallel for considerable distances the company's tracks, have brought into the area 17 motor bus routes. Evidently, virtually every one who lives in the area has a choice and may travel by the company's interurban cars or by a bus. The most important exception is an amusement park known as The Oaks. In the summer months it offers various attractions, but in the remainder of the year it centers largely upon a skating rink. Its location denies ready access to the bus routes, but we observe from the record that it provides for the free use of its patrons a large automobile parking area.

The evidence indicates that the busses charge those who live in the company's area no more than does the company itself. They offer schedules that compare favorably with the company's, and after it became necessary for the company's passengers to transfer from the company's electric cars to a bus at Front and Hawthorne streets, the busses delivered their passengers into Portland's west side area more promptly than the electric cars.

Order 36459 which was announced December 26, 1958, and which "rescinded effective this date" Orders 34218, 35219, and 35782, states:

"On trial in the Circuit Court it appeared that since the abandonment of service by the Traction

Company on January 25, 1958 Inter-City Busses had obtained additional equipment and increased the frequency of its schedules traversing the Company's service area by something in excess of 33 1/3%, all routes considered. Inter-City Busses' patronage increased gradually over the period January 1958 through October 1958 so that during the latter weeks of the period concerned a total increase in Inter-City bus patronage approximating 40% of the previous Portland Traction Company patronage was noted."

The commissioner entered no finding that the company failed to establish with evidence that the passenger transportation upon which the area would have to depend after the company withdrew its electric cars would not be "just, reasonable and adequate." Likewise, he made no finding that public convenience and necessity required the continuance of the company's passenger service.

We believe that the complaint is fairly susceptible to an interpretation that it not only charged that the three challenged orders deprived the company of constitutional rights but that it also set forth facts which ORS 760.205—760.255, supra, authorized the commissioner to deem a sufficient basis for permitting the company to abandon its passenger service. During the hearing before the commissioner and during the trial in the circuit court statements were frequently made that the sections of the laws just cited were applicable to this proceeding. For example, near the beginning of the hearing the commissioner, through his examiner, recognized that this proceeding was brought in part under ORS 760.205—760.255. The examiner stated:

"* * * taking into consideration the inherent nature of the case it also might be said that it is in the nature of an application on the part of

> Portland Traction Company to abandon, and I earlier considered these matters pertaining to method and conduct of the hearing, and I concluded that perhaps in order to keep within the proper realm of procedure that we'd best construe this particular hearing more in the nature of an application to abandon more so than a general investigation, and that is the basis that I am operating on at the present time until I can be convinced otherwise."

Later, the commissioner inquired of the company's counsel:

> "Do you object to the inclusion of public convenience and necessity of patrons and residents of the service area as another matter that needs full and fair consideration?"

The company's counsel replied:

> "I have no objection to the evidence being offered on that. But, I wanted to state that the two are tied together in our theory of the case."

The examiner clarified the issues by declaring:

> "Now, as I understand it, the applicant is proceeding under Chapter 415 of the Laws of 1957, and under that section of law a hearing is in order. An applicant is to go forward and meet the burden of proof, and he is entitled to do that in any way he sees fit; in other words, put on such evidence that he thinks or it thinks is necessary to meet that burden. Now, that is in the nature of an application, an application to the commission to abandon."

The "Laws of 1957" to which the examiner referred are, of course, ORS 760.205—760.255.

When the cause was before the circuit court the commissioner's attorney, in addressing the judge, stated:

> "Our position is, when the Commissioner is presented with an application to abandon service, his

decision is whether or not public convenience or necessity require the continuance of service, and the language of the U. S. Supreme Court is that these might be relevant but they are not controlling. * * *"

The foregoing will suffice as a review of the issues and of the evidence. We have observed that the issue of abandonment is controlled by ORS 760.205—760.255, supra. In Railroad Service Discontinuances, 43 Minn. L Rev. 275, a member of the faculty of the University of California, in the course of a comprehensive review of the available decisions, states:

"Recently a number of state courts have taken a new view of public necessity when reviewing commission denials of passenger service discontinuances, and many commission denials of discontinuances have been reversed. The change has been in the relative weight of the evidence required. The burden of proof of lack of public necessity is, of course, still on the carrier petitioning to discontinue services presently rendered pursuant to its franchise. The new approach to sustaining this burden, which has been approved by the courts of many states, requires the carrier to prove its direct operating loss and meet the test of only *one* of the two elements of public necessity outlined in the Illinois Central case. Proof of direct operating losses on the trains to be discontinued plus adequate substitute bus service was sufficient in six states to reverse commission denial of discontinuance. In these cases the carrier did not have to prove lack of use, although usually the patronage was slight. Likewise, proof of direct operating losses on the trains together with evidence that the public had virtually abandoned use of the trains was a sufficient ground in eight states to reverse a commission denial of discontinuance. In these cases, adequate substitute public transportation did not have to be proved. In effect this is a recog-

nition that in many areas the private automobile has replaced public transportation. Thus, an entire passenger train will not be required to operate to carry the very few people who prefer trains to buses or private automobiles. The courts distinguish public necessity from transportation needs of a few individuals who wish to continue riding trains. * * * Some evidence of the public's need for the service must be offered by the individuals or municipalities protesting a discontinuance petition."

*Illinois Central R. R. Co. v. Commerce Commission*, 410 Ill 77, 101 NE2d 588, had its inception in a petition which the Illinois Central Railroad Company filed with the Illinois Commerce Commission requesting permission to discontinue the operation of two passenger trains between Chicago and Carbondale. If out-of-pocket expenses only were considered the operation of the two trains did not yield a loss, but if there was assigned to the trains their fair share of total expenses a sizeable net loss was shown. In that case, as in the one at bar, the protestants to discontinuance claimed that the railroad had not done all that was reasonably possible to create patronage for the trains. The patronage was small. In sustaining the judgment of the trial court which set aside the order of the Illinois Commerce Commissioner requiring the continued operation of the trains, the court said:

"Both parties to the present cause agree that in determining the existence of public convenience and necessity three factors should be considered: (1) the cost of providing the service; (2) the use made by the public of the service; and (3) the availability and adequacy of other transportation facilities. * * *

* * *

"In determining questions of public convenience and necessity today, consideration must be given to the fact that railroads no longer have a monopoly of transportation. Older decisions, requiring the continuance of particular passenger-train services even though conducted at a loss, were rendered in a period when railroads provided the principal source of land transportation. Horse-drawn vehicles provided little if any competition. Today, on the other hand, railroads are in competition with bus and truck lines as well as private automobiles traveling over a vast system of improved highways built, not by private capital as is the case with rail carriers, but by public expenditures. They are in competition also with government subsidized waterways and, in recent years, with the expanding activities of air lines. In the light of such changed conditions it is a duty of the carrier to seek, and of the regulatory agency to permit, elimination of uneconomic services no longer needed or used by the public to any substantial extent. The reasons which originally may have provided justification for compulsory facilities maintained at substantial losses have largely disappeared today, rendering local train service in many cases an obsolete form of transportation. Recognition of such factors by regulating bodies not only results in financial benefit to the railroads but, by eliminating unnecessary passenger-train service, makes possible more economical transportation for the public on the trains which remain in substantial demand.

"We conclude that the order of the commission in the case at bar has no substantial foundation in the evidence. Under the manifest weight of that evidence, the economic waste involved in the operation of the two trains outweighs what small benefit and convenience they may afford to the public, and no substantial curtailment of services would be incurred by their removal. * * *"

Notes and Comments, 31 N.C. L Rev. 137, in review-

ing many decisions that passed upon passenger train abandonment cases, states:

> "The very fact that a line of railroad does not pay the expense of running some of its trains is cogent evidence that public convenience and necessity does not require that they be kept in operation."

The discourse adds:

> "A case for discontinuance is materially strengthened when alternative services are available, whether over the lines of the applicant carrier or some other railroad, or merely by virtue of the existence of adequate highways or bus service."

■ We deem it unnecessary to review the authorities any further. It is evident from the ever increasing financial losses that the operation of the passenger service created, together with the fact that the number of passengers was less than one per train mile, that the public was no longer giving its patronage to the railroad. We also think that it is clear that bus lines together with private automobiles were capable of taking care of those who previously patronized the company's cars.

ORS 760.205—760.255, as we have observed previously, provides that it must appear, before a carrier will be permitted to withdraw its facilities, that the remaining service will be of such character that it will provide "just, reasonable and adequate" transportation for the area. In view of the fact that the Honorable Howard Morgan, immediately before he voluntarily resigned from the office of commissioner, entered on December 26, 1958, Order 36459 which "rescinded effective this date" Orders 34218, 35219 and 35782, we think that it is safe to believe that transportation facilities remained after the rescission of those orders

that were "just, reasonable and adequate" to take care of the area's needs.

Nothing was disclosed in the evidence which indicated that the conditions that existed November 25, 1957, when the company gave notice of intention to quit its passenger service was substantially different from December 26, 1958, when the commissioner entered his order of rescission. The fundamental facts that were injurious to the company's patronage was its inability to run cars across the Hawthorne Bridge and over the west side streets.

■ The foregoing convinces us that the circuit court properly sustained the company's right to discontinue its passenger service. The court should not, however, have enjoined the commissioner "From instituting or prosecuting any proceedings against the plaintiff for the collection of any penalties by reason of plaintiff's noncompliance with the requirements of said Order No. 35782 and the provisions of Orders Nos. 34218 and 35219 incorporated therein by reference, as altered, modified or amended by said Order No. 36459." Proceedings of penal nature should never be enjoined by a court of equity. We express no opinion as to whether or not any action of that kind may be maintained against the company. Apart from that modification, the decree of the circuit court is affirmed.

SLOAN, J., dissenting.

There are two issues presented for decision in this case. The first issue is of significance now only in respect to the relationship it bears to the second. The first is: Has plaintiff sustained the heavy burden it must bear in proving "by clear and satisfactory evi-

dence that the order of the commission[①] complained of is unlawful and unreasonable?" ORS 760.580 (4).

Second, if it is held that the Commissioner's order was not supported by the evidence, does that permit a utility to arrogantly defy the lawful process required by the laws of this state? If the first question is answered in the negative it is, of course, obvious that plaintiff has been guilty of unlawful conduct. If it can be held that the evidence does not support the Commissioner's order does that sanctify plaintiff's conduct? The latter problem is the only thing remaining to be decided in this long, and thus far, inconclusive litigation. The majority leave the solution dangling for continued legal maneuvering. Every fact that could be presented is now here for the third time. It is the only issue actually urged by the parties. It was the only reason that the court did not declare this case moot when it was last here. *Portland Traction Co. v. Hill,* 1960, 222 Or 636, 639, 352 P2d 552, 353 P2d 838.

The history of the litigation is only partially revealed in the opinion in the former appeal and in another preliminary proceeding that came to this court in *Morgan v. Portland Traction Co.,* 1958, 222 Or 614, 331 P2d 344. It would be useless to describe the legal gymnastics exercised by plaintiff to successfully delay any judicial review of the Commissioner's order until sufficient time had passed to frustrate any attempt to enforce it or even to reasonably review it. Review is now an exercise in futility.

ORS 760.580 provides that any railroad aggrieved

---

[①] This statute was initially enacted as a part of Chapter 53, Oregon Laws 1907, which created the Railroad Commission. The Revised Code still uses the word "Commission" in part, rather than the word "Commissioner."

by an order of the Commissioner may appeal to the circuit court of Marion county for review. The statute requires the Commissioner to file an answer within 10 days after the filing of a complaint and thereupon the "suit shall be at issue and stand ready for trial upon 10 days' notice by either party." ORS 760.580 (2). Subsection (3) gives all suits brought within this statute precedence over all other civil litigation. ORS 760.585 by reference to 757.570 permits the circuit court to stay the order of the Commissioner pending determination of the review. This statutory form of review is "the exclusive method of testing the validity of the Commissioner's order." *Morgan v. Portland Traction Co.*, supra 222 Or at 622. This remedy was available to plaintiff at any time after the order was entered on January 25, 1958.

The opinion in *Portland Traction Co. v. Hill*, supra, 222 Or 645 and 646 said:

> "The foregoing discloses that there are two periods of time that are pertinent to the issues of this case. The first period began January 25, 1958, when the Commissioner entered order No. 35782, and extended to November 10, 1958, when the circuit court entered its order (quoted in a preceding paragraph) which stayed the operation of Order No. 35782. The stay order was entered pursuant to ORS 756.590. The second period began November 10, 1958, when the court's stay order was entered, and ended December 26, 1958, when the Commissioner 'rescinded effective this date' Order No. 35782 and its two preceding auxiliary orders."

Plaintiff's status from January 25, 1958, until November 10, 1958, is now our only concern. It is only necessary to review the record to determine if the Commissioner's order of January 25, 1958, was so absolutely void that it could be violated and frustrated into a nullity during that time with impunity.

It is my view that evidence in the record, not examined by the majority opinion, sustained the Commissioner's order. At the very least, the evidence I propose to mention would have required remanding the case to the Commissioner for additional findings, if the case had been brought here in the orderly process provided by law. Before proceeding to discuss facts I believe important to consider, it would be helpful to call attention to certain policy determinations made by the legislature by which we are, or should be, governed. The first is the basic concept of the power of the Commissioner and the clearly expressed functions delegated to that official. It is set forth in ORS 756.040 (1).

"In addition to the powers and duties now or hereafter transferred to or vested in the commissioner, he shall represent the patrons and users of the service and consumers of the produce of any public utility, and the public generally in all controversies respecting rates, charges, valuations, service and all matters of which he has jurisdiction."

It is thus apparent that the Commissioner was not established to function as a referee only. He is to protect the public. Other provisions of the statutes in respect to the regulation of utilities justify this concept of the Commissioner's duties. We may not agree that such was a wise policy but that is not our choice to make.

Secondly, and previously mentioned, the statute places the burden on the utility to overthrow a Commissioner's order and further provides, ORS 757.545, the order shall be "prima facie lawful and reasonable unless and until found otherwise in a suit brought for the purpose under ORS 757.565 to 757.585." And further that a complaining utility is "not entitled to

have the court below substitute its judgment for that of the Commission or determine matters which properly fell within the province of that body." *Southern Pacific Co. v. Campbell,* 1913, 230 US 537, 552, 33 S Ct 1027, 57 L Ed 1610. This was a case in which the Supreme Court denied a constitutional challenge to the Oregon Act of 1907 creating the Railroad Commission.

The evidence before mentioned and the finding of the Commissioner based thereon which would have supported the order denying abandonment was summarized in the Commissioner's challenged order of January 25, 1958, in these words:

> "In the face of the management's conduct, as revealed in the record of this and previous proceedings, it is difficult to escape a conclusion that Respondent sought in every way possible to ruin its passenger business and thereby lay claims to justifying the abandonment of this business."

. A similar specific finding was made by the Commissioner.

It cannot be disputed that if the evidence reasonably supports that finding, that the order should have been sustained. A railroad will not be permitted to abandon service for lack of passengers when it appears that the lack of patronage has been deliberately caused or results from mismanagement. *Broad River Power Co. et al, v. Southern Carolina ex rel Daniel,* 1930, 282 US 187, 51 S Ct 94, 75 L Ed 287, an opinion concurred in by four justices in an eight man decision. The court was divided in the reasons for dismissing the appeal. *State ex rel Daniel v. Broad River Power Co.,* 1929, 157 S Car 1, 153 SE 537, the decision appealed from in the case just cited. *Gardner v. Com-*

*merce Commission,* 1948, 400 Ill 123, 79 NE2nd 71, a case in which the facts are similar to the one at issue.

The evidence in the record here does support that finding of the Commissioner. The best evidence is to be found by a review of similar findings made by the Commissioner in the several other hearings had in the long and turbulent history of this utility's efforts to rid itself of the duty to carry passengers. It should be mentioned, however, that this was not so much a running fight between the respective Commissioners and plaintiff but between plaintiff and the people both it and the Commissioners were required to serve.

What efforts plaintiff made prior to 1952 to accomplish this purpose does not appear in the record. But in 1952 it did file with the Commissioner an application to abandon passenger service. It was denied. One of the findings of the Commissioner, entered by order dated February 10, 1953, was:

> "The record is nearly void as to evidence of good faith efforts upon the part of the applicant its officers and employees, to encourage passenger patronage except for convenient operating schedules; * * *"

It is also important to note the Commissioner found plaintiff's claimed estimated losses were not supported by actual records of revenues and expenses. For that reason the Commissioner declined to accept the verbal testimony of plaintiff's general manager as to estimated losses.

There was no appeal from the February 1953 order of the Commissioner.

In July 1954, plaintiff again filed an application to abandon its passenger service and again extensive

hearings were held. The Commissioner again denied the application and his order, dated April 22, 1955, contains these findings:

> "There is little evidence of any real effort on the part of Applicant to encourage additional passenger patronage, aside from the purchase of some used passenger equipment which has proved to be a worth-while improvement. The record discloses that most of Applicant's passenger stations are in need of repair and that maintenance of these facilities is sadly neglected. Furthermore, there appears to be an extremely limited concern upon the part of the Applicant, its officers and employees, regarding the welfare of passenger operations and service, and practically no effort has been made to solicit additional patronage. It would appear that the main reason patronage keeps nearly abreast of costs of operation is because there is no other adequate form of public transportation available along most of Applicant's lines, and because of the undisputed dependability of the Interurban service schedules."

It is also significant to note the Commissioner's findings in respect to plaintiff's claims of losses sustained for the operation of its passenger service. The plaintiff had claimed losses for 1953 and for the first nine months of 1954 totaling more than $44,000. The Commissioner analysed the losses claimed and made these findings:

> "In other words the total out-of-pocket loss for the 21 months period of time was for all practical purposes $10,563, instead of $44,683.05.
>
> "* * * Although in light of fully distributed costs generally, the Applicant has experienced operation losses respecting its passenger operations, nevertheless, the actual normal out-of-pocket losses are nominal. In light of overall net incomes to earned surplus, after deduction of passenger losses, and in

view of dividends paid out, the actual normal out-of-pocket losses are negligible."

On August 20, 1955, plaintiff abruptly reduced its passenger schedules. The Commissioner later found that this was done without "request for approval by the Commissioner, * * *" Patrons of plaintiff protested and again extensive hearings were held and on February 17, 1956, the Commissioner entered order No. 34218 by which plaintiff was ordered to restore most of the reduced service and was also ordered to "provide clean and well-lighted passenger stations and equipment."

"The present reduced operating schedules (except for midday service Mondays to Fridays, inclusive, concerning which little complaint was found by staff witnesses) are generally arranged in such a manner that they do not fit in with the employment hours of the riders, especially during the early morning hours and late evening hours on week days including Saturdays. Many patrons, in pursuit of their occupations, have been unable to use the new schedules and thus have been virtually deprived of any means of transportation to and from their employment. The present reduced schedules are so arranged—principally during peak hours including Saturdays—that they force patrons to leave home from one-half hour to an hour earlier than usual in order to accommodate themselves to the only transportation available to them and to wait after work from periods ranging from one-half hour to an hour for transportation to their homes. The inadequacy and inconvenience by reason thereof is not only opposed to the public interests, but is also causing loss of patronage."

\* \* \* \* \*

"The operations picture indicates that passenger patronage has been and is being presently discouraged rather than solicited and encouraged."

\* \* \* \* \*

"* * * recent reduction of schedules, together with the limited concern upon the part of Defendant for the welfare of passenger operations and service, is establishing conditions which tend to bring about a gradual disintegration of passenger patronage."

* * * * *

"There has been little effort on the part of Defendant to provide an efficient public service so far as cleanliness of stations and equipment are concerned."

And, again, the Commissioner analysed plaintiff's claim of operating losses. As a result this finding was made:

"* * * Thus the normal estimated out-of-pocket loss to Defendant from passenger operations for the first eight months of 1955 was $17,318.84 instead of $60,687.18 as represented by Defendant.

"Notwithstanding this actual out-of-pocket loss of $17,318.84, financial reports of Defendant for the first eight months of 1955, as compared with the first eight months of 1954, disclose that it enjoyed an increase in Net Income to Earned Surplus in the amount of $54,333.63. Furthermore, as shown by Appendix 'B' attached hereto (a computation of estimated rate of return upon operating property and investment of combined freight and passenger interurban service, based upon annual reports on file with the Commissioner) Defendant enjoyed an average annual rate of return of approximately 28.44% during the first eight months of 1955, which is nearly seven times greater than the average rate of return of American Railroads as published in official reports of the Interstate Commerce Commission. Generally speaking, then, it may be safely assumed that actual out-of-pocket losses are negligible and not jeopardizing the financial health of the Defendant nor unduly burdening Defendant."

No appeal was taken from that order.

This and other determinations by the Commissioner create a doubt that must be expressed as to plaintiff's claims of excessive financial loss. It appears that plaintiff's annual rate of return has not, at any time, been less than four times that of the average of American Railroads. I also reproduce and underscore this last finding of the Commissioner to show plaintiff's distortion of its financial condition that has been common through all of these proceedings. We abuse our power of review when we refuse to accept these repeated findings of the Commissioner; each one buttressed by detailed evidence.

On September 17, 1956, plaintiff's rails across the Hawthorne bridge in Portland were severed. Both before and after that date various orders were entered by the Commissioner in attempt to compel plaintiff to continue to provide service to the west side of the Willamette river by bus. It is unnecessary to detail the several orders that were made to endeavor to require plaintiff to provide some reasonable service to its patrons. Some of the orders were ignored, others performed perfunctorily. On November 29, 1956, plaintiff gave notice it would discontinue any shuttle service across the river as of January 1, 1957. Again, the Commissioner's jurisdiction was invoked and extensive hearings were had which resulted in an order of the Commissioner dated March 18, 1957. That order directed plaintiff to restore the shuttle service to and from the west side of the Willamette river in accordance with a former order of the Commissioner. It also directed plaintiff to provide a suitable passenger station and shelter facilities for the use of its patrons at the terminus of the interurban line.

Also, in this order, the Commissioner again made specific findings as to acts and omissions of plaintiff

to discourage passenger traffic. This included a finding that plaintiff's officers had encouraged bus lines to enter the area served by plaintiff and compete with it for patronage. Some of the findings were:

"From the foregoing it is concluded that continuously since January 1, 1957, Respondent has wilfully refused to furnish the adequate passenger service required by Order No. 34218, issued February 17, 1956, and Order No. 34761, issued September 10, 1956, providing for a minimum passenger service schedule and suitable accommodations for its patrons.

"It is further concluded that Respondent's failure to comply with these Orders has had a damaging effect upon its patronage which could not have been unexpected by Respondent's management.

"It is further concluded, and is abundantly shown by the record, that the Respondent has embraced every circumstance adverse to the encouragement of and proper service to its patrons, while failing, neglecting and refusing to take prudent advantage of the long-continued and presently-existing circumstances which favor a steady and remunerative passenger traffic upon its rail lines."

There were also detailed findings as to plaintiff's financial ability to provide the service ordered. And a finding that plaintiff's efforts to discourage passenger use of its facilities were inspired by opportunities to very profitably sell its lines to one or more of the major railroads if it could divest itself of the passenger traffic.

This order of March 18, 1957, was appealed to the circuit court of Multnomah county. The court heard additional evidence and, in the person of Judge Herbert Hardy, sitting pro tempore, made this pertinent finding:

"Under this cause of suit plaintiff first alleges that the defendant's findings of fact and conclu-

sions are insufficient to support the order, and then argues that the findings are unsupported by the evidence. In view of the plaintiff's burden in a suit of this nature, it would have been more appropriate specifically to set forth what findings were necessary to the order that have been omitted. However, because of plaintiff's charges and the importance of this case this Court has considered each finding; has read the entire record of the hearings before the defendant, which consist of seven volumes of testimony; has reviewed portions thereof several times; has heard and thereafter read the evidence presented before this court; and is of the opinion *that each fact found by the defendant and set forth in the order is based upon cogent, competent, material and substantial evidence.*" (Emphasis ours.)

The circuit court's order of affirmance was appealed to this court and later dismissed. However, that does not detract from the weight of the trial court's determination as to what the evidence proved.

The shabby treatment afforded its patrons by plaintiff during the several years in question gives plentiful support to the finding in the Commissioner's challenged order of January 18, 1958, "* * * that the losses in passenger revenues incurred by [plaintiff] have been the result of deliberate attempts on the part of [plaintiff] to curtail its service, * * *." It is unnecessary for present purposes to extend this long opinion and detail the evidence which supports the several findings of the respective Commissioners. Plaintiff has not sustained its burden of showing that the findings are not true. Indeed, it could not. The findings are supported by evidence. We are obliged to give these findings the respect required by law. If that were done, it would require that we sustain the attacked order.

But assuming the majority's view of the evidence to be correct, does that enable plaintiff to take the law into its own hands and defy the lawful authority of this state? This issue is vital to the legislative, administrative and judicial processes by which we are governed. The answer must be in the negative. Otherwise we would be confronted with the chaotic condition that any person whose conduct may be subject to regulation by the state could ignore any restraint upon his absolute freedom of choice. That would be true whether the authority was exercised by the judiciary, an administrative body or otherwise. The orderly processes provided by law for the expeditious determination of such issues would be meaningless and empty. No one doubts the power of the state to continue to confine one charged with or convicted of a crime pending trial or review by appeal although there has been a substantial claim that the conviction violated constitutional rights. And if it be ultimately held that the conviction was unconstitutional the loss of liberty pending decision suffered by the imprisoned is deemed to be one of the costs we pay for living in an ordered society regulated by law.

"The rule of law—the preservation of government under law—depends upon the principle of legitimacy—upon voluntary acceptance of decisions arrived at and written into law by estabished legislative and judicial processes. Those who seek to escape the force of legal obligations until compelled by superior power are guilty of gross disservice to the cause of freedom because when law loses the power to secure voluntary compliance, it is all too likely to be replaced by force."②

---

② Solicitor General Archibald Cox, Law Day Address, Portland, Oregon, May 1, 1962.

It is my view that plaintiff's duty to obey the order until stayed by judicial review was conclusively decided in *Morgan v. Portland Traction Co.*, supra 222 Or 614. We there held that the procedure for review provided by statute was exclusive. It follows that until plaintiff availed itself of that right it was bound to conform to the lawful mandate of the Commissioner. It must also be recognized that the decision in *Morgan v. Portland Traction Co.*, supra, affirmed a mandatory injunction directing plaintiff to obey. So plaintiff has not only refused to obey the Commissioner's order, it ignored the order of the court.

It cannot be claimed that the Commissioner did not have jurisdiction of plaintiff and of the subject matter. If there was error at all it was not such error as would have rendered the order absolutely void. In *United States v. United Mine Workers of America*, 1947, 330 US 258, 293, 67 S Ct 677, 91 L Ed 884, the court said:

"* * * proceeding further we find impressive authority for the proposition that an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings. This is true without regard even for the constitutionality of the act under which the order is issued."

In *Atlantic Coast Line R. Co. v. State of Florida*, 1935, 295 US 301, 311, 55 S Ct 713, 79 L Ed 1451, 1458, the court had for consideration the effect of a rate order of the Interstate Commerce Commission that had previously been set aside by the Court, it was said:

"* * * Thereafter the order was adjudged void by a decision of this court * * *, but void solely upon the ground that the facts supporting the conclusion were not embodied in the findings. Void in such a context is the equivalent of voidable

* * * [citing cases]. The carrier was not at liberty to take the law into its own hands and refuse submission to the orders without the sanction of a court." 79 L Ed 1458.

*City of Gainesville v. Gaines. G. & E. Pow. Co.,* 1913, 65 Fla 404, 411, 62 So 919, 921, was a case quite similar to the instant one. There the City had passed certain ordinances regulating the defendant utility. The latter claimed that the ordinances were unduly arbitrary and burdensome. The trial court had refused an injunction to compel the utility to conform to the ordinances pending judicial review. The court held:

"* * * If the regulations imposed by the city are in law and in fact illegal for any reason, the company has its complete and adequate remedy by appropriate proceedings; but the company being engaged in rendering a public service must continue to do so in a reasonably adequate manner until relieved of its duty by due process of law. Illegal municipal regulations are not binding; but persons and corporations cannot be permitted to arbitrarily assume to remedy an alleged wrong by refusing to render a public service voluntarily undertaken."

*Thermoid Western Co. v. Union Pacific Railroad Co.,* 1961, 12 Utah 2d 256, 259, 365 P2d 65, 67, decided that:

"* * * It is to be remembered that generally when a court or administrative body is dealing with a controversy of the kind it is authorized to adjudicate, and has the parties before it, it has jurisdiction. And jurisdiction does not depend upon the regularity of the exercise of its power or the correctness of decisions made.*" (Footnote omitted).

*United States v. Shipp,* 1906, 203 US 563, 27 S Ct

165, 51 L Ed 319, has meaning here. The case came to the Supreme Court on a charge of contempt against a Tennessee sheriff. The sheriff had been responsible for the custody of a negro who had been convicted of murder. The convicted man was lynched, with the connivance of the sheriff, while a habeas corpus appeal had been pending in the Supreme Court. It was argued in behalf of the sheriff that the Court could not have had jurisdiction in the habeas corpus proceeding, and, therefore, it was beyond the power of the Court to exercise any restraint upon the sheriff while the habeas corpus case was pending. The Court held that even if it had not had jurisdiction it was wrongful for the sheriff to act until that question had been decided by the Court. The court recognized that the order of a court not having jurisdiction cannot be enforced but that the party could not gamble on the Court's ultimate decision while the case was being decided. *Chicot County Drainage Dist. v. Baxter State Bank et al,* 1939, 308 US 371, 60 S Ct 317, 84 L Ed 329, is also worthy of consideration in reaching decision in this case.

The concurring opinion of Justice Frankfurter in *United States v. United Mine Workers of America,* supra, 91 L Ed 920, should be required reading for those who may think that rigid adherence to lawful process can be avoided when that process is inconvenient or difficult for either the state or the citizen. Or if one has doubt that a citizen should be required to conform to that process until its fulfillment reaches ultimate judgment, he should read that opinion.

There are not many cases involving the right of a party to ignore an administrative order or process. Most of the cases, including the important one of *Yakus v. United States,* 1944, 321 US 414, 64 S Ct

660, 88 L Ed 834, are mentioned or discussed in the former opinion of this court in *Morgan v. Portland Traction Co.,* supra, 222 Or 614, 628. Further discussion is unnecessary. It is my view that during the period of time that plaintiff refused to seek the expeditious judicial review available to it plaintiff stood in the position of an outlaw. And, further that that question should be decided now.

Two other arguments advanced by plaintiff require consideration. First, plaintiff claims that the Commissioner could not look to its total earnings, both freight and passenger, to determine if continued operation of its passenger service at a loss would, *ipso facto,* result in confiscation of its property. The law is clearly to the contrary.

> "* * * It has long been settled, however, that a requirement that a particular service be rendered at a loss does not make such service confiscatory and thereby an unconstitutional taking of property." Frankfurter, J., in a concurring opinion in *Alabama Comm'n v. Southern R. Co.,* 1951, 341 US 341, 352 71 S Ct 762, 95 L Ed 1002, 1010, citing numerous cases, not necessary to repeat here.

In the several findings and orders of the Commissioner, before mentioned, the Commissioner properly considered the total financial health of plaintiff. Detailed findings as to earnings and costs were made. In each instance it was found that plaintiff's financial status was excellent. In the years beginning with 1952, when plaintiff first attempted to abandon, through 1957, plaintiff's parent company received dividends in the amount of $2,455,000 upon its investment in plaintiff and the intracity transit lines in Portland. Nearly all of the earnings came from plaintiff. The total investment allocated to plaintiff was about

$1,000,000. Other indicia of prosperity has already been mentioned. The evidence referred to satisfied the Commissioner in each instance that plaintiff would not suffer confiscation if the passenger service were to be continued.

Second, plaintiff contends that the enforced continuation of its passenger service would interfere with interstate commerce and was, therefore, invalid. Plaintiff claims that only about four percent of its revenues were derived from intrastate service; the remainder was interstate; that to use interstate revenue to provide intrastate service would impair its interstate obligations. The Supreme Court has consistently held that such a determination must first be made by the Interstate Commerce Commission. The Court has refused to consider the question until the ICC had first decided it. *Western & Atlantic v. Public Comm.*, 1925, 267 US 493, 45 S Ct 409, 69 L Ed 753; *Alabama Comm'n v. Southern R. Co.*, supra, 341 US 341.

There is one reason for decision advanced by the majority that requires mention: It is said that there was no difference in plaintiff's condition on December 26, 1958, when the Commissioner rescinded prior orders, and its condition on January 25, 1958, when the Commissioner entered the order requiring continued service. The majority ignore the compelling fact that on and prior to January 25, 1958, plaintiff's passenger service was in actual operation. On December 26, 1958, by reason of plaintiff's unlawful conduct, the service was dead beyond recall, and so was any need for further administrative or judicial proceedings. But we do not remain powerless to hold plaintiff to the penalties it has earned. We, no less than the Supreme Court of the United States in the cases cited,

have a responsibility to preserve lawful process. We should not evade that responsibility.

The decree should be reversed.

O'CONNELL, J., joins in this dissent.