**1334**

HUGHES AIR CORP., dba Hughes Airwest, the Flying Tiger Line, Inc., Delta Air Lines, Inc., American Airlines, Inc., Air California, Western Air Lines, Inc., United Airlines, Inc., Trans World Airlines, Inc., Continental Air Lines, Inc., Pacific Southwest Airlines, and Pan American World Airways, Plaintiffs-Appellees,

and

United States of America and Civil Aeronautics Board, Intervenors-Appellees,

v.

The PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA, Robert Batinovich, Vernon L. Sturgeon, William Symons, Jr., Richard D. Gravelle, and Claire T. Dedrick, the members of and constituting said Public Utilities Commission, Defendants-Appellants.

SIERRA FLITE SERVICE, INC., Plaintiff-Appellee,

and

United States of America and Civil Aeronautics Board, Intervenors-Appellees,

v.

The PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA et al., Defendants-Appellants,

Oregon Public Utility Commission, Intervenor-Appellant.

Nos. 79–4272, 79–4510 and 79–4751.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 13, 1981.

Decided May 11, 1981.

Randolph W. Deutsch, San Francisco, Cal., Mark H. Gallant, Washington, D. C., for Public Utilities Comm.; Janice E. Kerr, San Francisco, Cal., on brief.

Gordon E. Davis, Brobeck, Pheleger & Harrison, San Francisco, Cal., Joseph B. Scott, Washington, D. C., for Hughes Air Corp.

Before SKOPIL and BOOCHEVER, Circuit Judges, and TAYLOR, District Judge.*

SKOPIL, Circuit Judge:

These cases arise under the Airline Deregulation Act of 1978, 49 U.S.C. §§ 1371–76, which preempts states from regulating certain interstate air carriers. The issues on appeal concern the applicability and constitutionality of the preemption provision. We must decide: (1) whether a carrier exempted from certification is within the scope of the preemption clause (*Sierra Flite* only), and (2) whether such federal preemption of state regulation is within the power of Congress under the commerce clause.

---

* The Honorable Fred M. Taylor, United States District Judge for the District of Idaho, sitting by designation.

## I. THE FEDERAL REGULATORY FRAMEWORK

The Federal Aviation Act of 1958, 49 U.S.C. §§ 1301 et seq., and other statutes [1] set up a comprehensive federal system regulating interstate air transportation. These statutes established the Civil Aeronautics Board ("the CAB" or "the Board"). The cornerstone of the federal regulatory system was Section 401 of the Federal Aviation Act of 1958, 49 U.S.C. § 1371, which prohibited entry into the field of interstate air transportation without a certificate of public convenience and necessity from the CAB. The Board's mandate applied only to "interstate, overseas or foreign air transportation."

Section 416(b)(1), 49 U.S.C. § 1386(b)(1), enabled the CAB to "exempt from the requirements of [Title IV] [2] or any provision thereof ... any air carrier or class of air carriers ..." Under the power of section 416(b)(1), the CAB had exempted a class of carriers known as "commuter air carriers" from the requirement of certification and many other aspects of economic regulation. 14 CFR Part 298. A "commuter air carrier" is a carrier that does not use large aircraft, does not hold certificate authority issued by the CAB, provides limited scheduled interstate service, has registered with the CAB, has and maintains liability insurance, and waives the liability limitation of the Warsaw Convention. *Id.*

Hughes Air Corporation and associated plaintiffs in No. 79–4272 (Hughes) are all air carriers certificated by the CAB pursuant to section 401(a). Sierra Flite is a commuter air carrier, and is exempted from most of the CAB's economic regulation, including the requirement to obtain a certificate, pursuant to section 416(b)(1).

Contemporaneous with this federal regulatory effort, several states, including California and Oregon, began regulating fares of intrastate airlines, as well as the solely intrastate activities of CAB-certificated or exempt airlines. The authority to regulate intrastate fares of interstate airlines was upheld by the California Supreme Court in 1954; the airlines' appeal from this decision was dismissed by the Supreme Court for want of a substantial federal question. *People v. Western Air Lines, Inc.*, 42 Cal.2d 621, 268 P.2d 723, *appeal dismissed sub nom. Western Airlines, Inc. v. California*, 348 U.S. 859, 75 S.Ct. 87, 99 L.Ed. 677 (1954). In California and Oregon such regulation is performed by the California Public Utilities Commission and the Oregon Public Utilities Commission ("the PUCs").

In 1978 Congress passed the Airline Deregulation Act of 1978, 49 U.S.C. §§ 1371–76 ("the Deregulation Act"). This Act marks a fundamental change in the "direction and policy of aviation regulation." It constitutes "comprehensive legislation" designed to provide a "gradual and phased transition to a deregulated system". H.R. Rep.No.1779, 95th Cong., 2d Sess. 56 (1978).

The Deregulation Act substantially revises the economic regulatory provisions of the 1958 Act. The statute limited the board's power to find fares unjustly or unreasonably high or low and, as of January 1, 1983, relieved carriers of all statutory obligations relating to tariffs and fares. The Board's correlative powers were terminated. Deregulation Act § 40(a), *adding* §§ 1601(a)(2)(A), (B), and (D) to the Federal Aviation Act.

Comparable changes were made in the areas of routes and services. The Deregulation Act liberalized the standard for granting exemption authority by deleting the requirement that the CAB find certification to be an "undue burden" and requiring only a determination that an exemption be "consistent with the public interest," Deregulation Act § 31(a), 92 Stat. 1731, and by expressly codifying the air taxi exemption, Deregulation Act § 32, 92 Stat. 1732.

Section 4 of the Deregulation Act contains a federal preemption provision bar-

---

1. Air Commerce Act of 1926, Ch. 344, 44 Stat. 568; and the Civil Aeronautics Act of 1938, Ch. 601, 52 Stat. 973.

2. Title IV of the Federal Aviation Act, 49 U.S.C. §§ 1371–87, covers economic regulation of air carriers.

ring state regulation of rates, routes, or services of certain CAB-authorized airlines, by adding the following section to the Federal Aviation Act:

Sec. 105(a)(1). Except as provided in paragraph (2) of this subsection, no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having authority under Title IV of this Act to provide interstate air transportation.

(2) Except with respect to air transportation (other than charter air transportation) provided pursuant to a certificate issued by the Board under Section 401 of this Act, the provisions of paragraph (1) of this subsection shall not apply to any transportation by air of persons, property, or mail conducted wholly within the State of Alaska.

It is the interpretation and constitutionality of this section that is the basis of the present litigation.

## II. PROCEEDINGS BELOW

After the enactment of the Deregulation Act, Hughes and Sierra Flite individually advised the California Public Utilities Commission ("the PUC") that they would thereafter provide all air transportation services within California in accordance with their tariffs on file with the CAB, and therefore cancel their intrastate tariffs on file with the PUC. The PUC refused to accept the cancellations.

Hughes sought declaratory and injunctive relief against the PUC in the district court. Sierra Flite requested similar relief separately in the same court. The United States and the CAB intervened as plaintiff-intervenor in both cases. The Oregon PUC intervened as defendant-intervenor in the *Sierra Flite* case.

The district court entered separate orders declaring that the Federal Aviation Act as amended by Section 4 of the Airlines Deregulation Act preempted all laws, regula-

tions and authority of California purporting to authorize the PUC to regulate the rates, routes and services of CAB-certificated interstate air carriers and of exempt commuter air carriers. It permanently enjoined the PUC from enforcing all such laws, regulations, orders and authority. The PUCs appeal.

## III. DID CONGRESS INTEND TO PREEMPT REGULATION OF EXEMPTED CARRIERS?

The first issue, which relates to *Sierra Flite* only, is whether Congress intended to include carriers exempted from CAB certification pursuant to section 416(b)(1) within the preemption provision.

■ The preemption provision preempts states from regulating the intrastate activities of any carrier "having authority under Title IV." The PUCs argue that "having authority under Title IV" applies only to carriers who have been granted authority to operate by CAB-certification, and that carriers exempted from certification and major economic regulation do not "hav[e] authority under Title IV." We disagree with this argument and hold that Congress intended to include carriers exempted from CAB certification pursuant to section 416(b)(1) within the scope of the preemption provision.

■ In interpreting a statute, our objective is to ascertain the intent of Congress. *Philbrook v. Glodgett*, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). The primary rule of statutory construction is to ascertain and give effect to the plain meaning of the language used. Section 416, under which the CAB is empowered to grant exemptions from the certification required by section 401, is a part of Title IV of the Act. Thus the section 416 exemption, like a Section 401 certification, comes within the terms of the preemption provision of section 105 as "authority under Title IV of this Act to provide interstate transportation".

The PUCs contend that the plain meaning of the word "authorize" does not include the concept of "exemption". We cannot agree. Carriers exempted from certifi-

cation still operate with authority granted by the CAB. Without an exemption they would be unable to operate in interstate commerce. They are also subject to economic regulation (the focus of Title IV), though less restrictive than that applied to certificated carriers.

■ Another basic rule of statutory construction is that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless. *Jacobson v. Rose*, 592 F.2d 515 (9th Cir. 1978), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298, *Patagonia Corp. v. Board of Governors of Federal Reserve System*, 517 F.2d 803 (9th Cir. 1975).

If we were to find that Congress intended to exclude exempted carriers from the preemption clause in section 105(a)(1), we would render section 105(a)(2) meaningless. In section 105(a)(2) Congress limited the scope of preemption in the state of Alaska to "air transportation . . . provided pursuant to a certificate issued by the Board under Section 401." If the term "authority under title IV" in section 105(a)(1) meant only certificate authority, as the PUCs claim, then there would have been no need for the Alaska exception. Every state would have enjoyed the power Congress specifically conferred upon Alaska—the right to continue to regulate airlines operating with CAB exemption authority. Congress' intent was made clear by the Conference Report, which states that the Alaska provision "requires that commuters in Alaska hold state authority". H.R.Rep.No.1779, 95th Cong., 2d Sess. 80 (1978), U.S.Code Cong. & Admin.News 1978, pp. 3737, 3793.

The PUCs contend, on the other hand, that including exemptions within the term "authority" as used in section 105(a) makes that section inconsistent with section 105(c). Section 105(c) provides that an intrastate air carrier's existing authority received from a state "shall be considered to be part of its authority to provide air transportation received from the Board under Title IV" upon its initial receipt of interstate

authority. This provision, intended to facilitate the granting of federal certificates encompassing a carrier's entire authority, clearly applies only to certificated carriers and not to carriers exempted from Title IV certificate requirements. Exempted carriers may provide interstate transportation on whatever routes they choose, and thus there is no point in their retaining their state-granted authority in any form. This argument, however, is not determinative. Simply because in this one instance the word "authority" refers only to certificated carriers does not imply that every time the word "authority" is used it means only certificated carriers. To construe "authority" as including both certification and exemption does less damage to the meaning of the statute taken as a whole.

There are several instances in the legislative history in which references to "authority" included both certification and exemption. For example, the Senate Report on its version of the bill stated that:

Clearly *a Federal grant of authority, whether a certificate or exemption*, to engage in interstate transportation should give the Federal government the sole responsibility for regulating that air carrier.

S.Rep.No.95–631, 95th Cong., 2d Sess. 98 (1978) (emphasis added).

An early Senate version of the Deregulation Act specifically triggered preemption for any carrier "certificated or exempted by the Board" under Title IV. S. 2493, § 17. The language adopted by the Conference Committee was derived from H.R. 12611 and used the phrase "authority under Title IV." Both sides claim that this change supports their view. The PUCs claim that "authority under Title IV" is narrower than "certificated or exempted". The CAB claims that it is broader. We note that the Conference Report makes no mention of this change. H.R.Rep.No.1779, 95th Cong., 2d Sess. (1978). If the Senate and House versions had different meanings, it is unlikely that the Conference Committee would have rejected the Senate version without comment, especially in light of the

detailed discussions of other differences in the Conference Report. We conclude that there is no difference between "authority under Title IV" and "certificated or exempted by the CAB".

We hold that carriers exempted from CAB certification pursuant to section 416(b)(1) are within the scope of the preemption provision.

## IV. TENTH AMENDMENT

The PUCs argue that the preemption provision violates the tenth amendment in two respects: (a) Congress must have a greater justification to regulate an activity that a state is regulating than to regulate activity not regulated by a state; and (b) state regulation of air transportation is an integral governmental function that cannot be interfered with by the federal government. We disagree with both contentions and hold that the tenth amendment is no bar to the federal preemption at issue here.

### A. Need for a Greater Justification

The greater justification required by the tenth amendment, the PUCs argue, means that Congress must (1) make substantial findings of the adverse impact of the intrastate activity on interstate commerce and (2) select the least restrictive means of regulation of the intrastate commerce. Thus the PUCs conclude, the regulation here (in the form of preemption) is improper since the state interest is very great, there have been no judicial findings of adverse impact, and other less restrictive regulation is possible.

The PUCs, in the alternative, dispute the existence of a sufficient impact on interstate commerce to constitute even a rational basis. In *Hughes*, the PUC contends that the claimed impact on federal subsidies is nonexistent, because California state law prohibits California from lowering rates so that the airline routes would be unprofitable and that the federal government could make the states share in the subsidy. In *Sierra Flite*, the PUCs claim that commuter carrier operations are overwhelmingly intrastate, and since the PUCs attempt to regulate only the intrastate portion of the operations there is little impact on interstate commerce.

■ The test proposed by the PUCs that Congress must make substantial findings of the adverse impact on interstate commerce and select the least restrictive means of regulation is incorrect.[3] Congress must only have a rational basis for its legislation and select a means of regulation reasonable and appropriate to achieve that end.[4] *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 258–59, 85 S.Ct. 348, 358, 13 L.Ed.2d 12 (1964).

■ The legislative history contains sufficient testimony and information about the impact of the carriers on interstate commerce to provide the requisite rational basis for federal preemption here. As to certificated carriers, there was testimony that state regulation could cause the airlines to raise interstate rates to support their intrastate operations, and could also lower intrastate fares so that federal subsidies would be necessary. As to exempted

---

**3.** All of the cases cited by the PUCs cite in support of their proposition that Congress must have substantial findings to interfere with state regulation of intrastate commerce deal with a statute that requires findings from the Interstate Commerce Commission before altering intrastate rates. *Chicago, Milwaukee, St. Paul and Pacific Railroad Co. v. Illinois*, 355 U.S. 300, 78 S.Ct. 304, 2 L.Ed.2d 292 (1958); *North Carolina v. U. S.*, 325 U.S. 507, 518, 65 S.Ct. 1260, 1266, 89 L.Ed. 1760 (1945); *Florida v. U. S.*, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931). Here it is Congress itself, not a regulatory agency required by Congress to make findings, that is altering state regulation.

**4.** It is not necessary for Congress to choose the least restrictive alternative in preempting state regulation of interstate commerce. In this case Congress "has reasonably determined that the preemption of contemporaneous state legislation is necessary to accomplish its legislative purposes." *Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294 (N.D.Cal.1977), aff'd, 571 F.2d 502 (9th Cir. 1978). *See also Chicago and N. W. Transp. Co. v. Kalo Brick & Tile Co.*, —— U.S. ——, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981).

carriers, there was testimony that commuter air carriers connect a significant number of interstate passengers with certificated interstate carriers and that the CAB's Small Community Program relies upon commuter air carriers to carry out the Congressional goal of guaranteed essential air transportation. The PUCs' arguments disputing the existence of a rational basis, even if valid, do not address all the possible impacts on interstate commerce mentioned above. The impact of state regulation on interstate commerce is not "clearly non-existent." We will not substitute our judgment for that of Congress. *Stafford v. Wallace*, 258 U.S. 495, 521, 42 S.Ct. 397, 403, 66 L.Ed. 735 (1922).

### B. *National League of Cities*

The PUCs argue that regulation of air carriers is such an integral and important aspect of state life that the federal government's preemption of this state regulation interferes with the state's sovereignty guaranteed by the tenth amendment. They cite *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) for this proposition.

In *National League of Cities*, the Supreme Court invalidated an attempt by Congress to prescribe minimum wages and maximum hours to be paid by the states as employers. The Court held that Congress acted beyond its authority under the Commerce Clause, U.S.Const. Art. I, § 8, cl. 3, and violated the tenth amendment by "wield[ing] its power in a fashion that would impair the States' 'ability to function effectively in a federal system' or displace the States' freedom to structure integral operations in areas of traditional governmental functions." *Id.* at 852, 96 S.Ct. at 2474. (citation omitted).

The Court in *National League of Cities* cited as examples of basic governmental services "fire prevention, police protection, sanitation, public health, and parks and recreation." *Id.* at 851, 96 S.Ct. at 2474. Other governmental services have since been held to be integral governmental functions.[5] Inclusion within this category has been evaluated on a case-by-case basis.

■ The PUCs argue that state regulation of air transportation is an integral governmental function. We disagree. There is little difference between state regulation of air transportation and state regulation of railroad transportation. In *United States v. California*, 297 U.S. 175, 184, 56 S.Ct. 421, 424, 80 L.Ed. 567 (1936), the court stated, "[t]he power of a state to fix intrastate railroad rates must yield to the power of the national government when their regulation is appropriate to the regulation of interstate commerce." This holding was expressly approved in the majority opinion of *National League of Cities*, the court stating "[t]here, California's activity to which the congressional command was directed, was not in an area that the states have regarded as integral parts of their governmental activities." 426 U.S. at 854 n.18, 96

---

**5.** Areas that have been held to be traditional government functions such that interference with them by other branches of government violated the tenth amendment include: operation of a municipal airport, *Amersbach v. City of Cleveland*, 598 F.2d 1033 (6th Cir. 1979); health care of the aged and sick, *NLRB v. Highview, Inc.*, 590 F.2d 174 (5th Cir. 1979); state licensing of automobile drivers, *United States v. Best*, 573 F.2d 1095 (9th Cir. 1978); and state legislature's adoption of rules for internal procedures, *Davids v. Akers*, 549 F.2d 120 (9th Cir. 1977).

The following have been held to not be integral governmental functions subject to the *National League of Cities* doctrine: regulation and management of game, *United States v. Helsley*, 615 F.2d 784 (9th Cir. 1979); setting of safety standards for automobiles, *Vehicle Equipment Safety Comm'n v. National Highway Traffic Safety Comm'n.*, 611 F.2d 53 (4th Cir. 1979); state operation of an oil and gas company, *Public Service Co. of North Carolina, Inc. v. Federal Energy Regulatory Comm'n.*, 587 F.2d 716 (5th Cir. 1979); state regulation of employee benefit plans, *Hewlett-Packard v. Barnes*, 425 F.Supp. 1294 (N.D.Cal.1977), *aff'd*, 571 F.2d 502 (9th Cir. 1978), *Standard Oil Co. v. Agsalud*, 442 F.Supp. 695 (N.D.Cal.1977); air pollution plans involving highway and bridge regulation, due to the interstate character of air pollution, *Friends of the Earth v. Carey*, 552 F.2d 25 (2d Cir. 1977); and state operation of a telephone company, *Puerto Rico Telephone Co. v. FCC*, 553 F.2d 694 (1st Cir. 1977).

S.Ct. at 2475 n.18. The *California* case presented a more compelling reason for asserting Tenth Amendment rights than the cases before us since a state-owned railroad was involved as opposed to private corporations. We hold that *National League of Cities* does not bar Congress' preemption of the state regulation at issue here.

## V. CONCLUSION

The district court properly determined that the PUCs may not regulate exempted carriers or the intrastate services of certificated carriers. The district court's judgments are AFFIRMED.