CITY OF ANGOON, et al., Plaintiffs-Appellees,

and

Sierra Club and the Wilderness Society, Intervenors/Plaintiffs-Appellees,

v.

John MARSH, Jr., Secretary of the Army, et al., Defendants,

and

Shee Atika, Inc., Intervenor/Defendant-Appellant.

No. 84–3819.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 8, 1984.

Decided Dec. 27, 1984.

As Amended March 27, 1985.

⟜815

**1414**

Durwood J. Zaelke, Sierra Club Legal Defense Fund, Inc., Washington, D.C., Frederick P. Furth, Furth, Fahrner, Bluemle & Mason, San Francisco, Cal., for appellees.

Richard Baenen, Pierre J. LaForce, Wilkinson, Barker, Knauer & Quinn, Washington, D.C., Robert L. Klarquist, David C. Shilton, Dept. of Justice, Washington, D.C., for intervenor/defendant-appellant.

Before WRIGHT, SNEED, and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

Appellant Shee Atika, Inc. (hereinafter Shee Atika) appeals from the district court's order granting a preliminary injunction enjoining the cutting of timber and related activities on Admiralty Island. The district court held that such activities violated section 503(d) of the Alaska National Interest Lands Conservation Act of 1980, Pub.L. 96–487, 94 Stat. 2371 *et seq.* (December 2, 1980) (partially codified at 16 U.S.C. § 3101 *et seq.*) (hereinafter ANILCA). ANILCA § 503(d) prohibits the sale or harvesting of timber on lands "within" National Forest Monuments. Shee Atika contends that the district court erred in holding that its lands were "within the Monument" and therefore subject to the section 503(d) prohibition against timber harvesting.

I

This interlocutory appeal represents the latest episode in the decade long struggle between the Shee Atika and the City of Angoon, the Sierra Club and the Wilderness Society (hereinafter Sierra-Angoon).[1]

Shee Atika is an Alaska Native Corporation established pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 *et seq.* (hereinafter ANCSA), to receive and administer the ANCSA benefits of the Natives of Sitka, Alaska. Its stockholders are some 1,900 Tlingit, Haida, and Tsimshian Indians.

The Sierra Club and the Wilderness Society are national conservation organizations. Both have long been committed to the maintenance of Admiralty Island as a wilderness area.

Admiralty Island is an island in southeast Alaska consisting of approximately 1.1 million acres of land. The island is sparsely populated. It is largely undeveloped. The City of Angoon, consisting of approximately 500 inhabitants, is the only permanent population center on Admiralty Island.

Congress enacted ANCSA in 1971 to settle the aboriginal claims of Alaskan Natives. ANCSA authorized the payment of almost $1 billion cash and the conveyance of approximately 40 million acres of land to Alaskan Natives as compensation for extinguishment of their claims and to assist them in achieving financial independence and self-sufficiency. *See* 43 U.S.C. § 1601 *et seq.* A portion of lands in the Hood Bay area of the southwest section of Admiralty

1. Jurisdiction is founded upon 28 U.S.C. § 1292(a)(1) which confers appellate jurisdiction with respect to "interlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions ...." An interlocutory appeal lies with respect to an order granting an injunction. 28 U.S.C. § 1292(a)(1).

Island was selected by Shee Atika as its ANCSA land entitlement.[2]

Sierra-Angoon challenged Shee Atika's selection of land on Admiralty Island by filing actions in the Federal District Court for the District of Alaska.[3] While this litigation was pending, members of Congress proposed a legislative solution to their dispute. This proposal led to the addition of section 506 to ANILCA. Section 506 authorized the conveyance of land located 35 miles from the City of Angoon to Shee Atika. Shee Atika ultimately agreed to accept approximately 23,000 acres in the northwest part of the island for the release of all claims to its selected land in the vicinity of Hood Lake.[4]

Shee Atika harvested timber on 276 acres during the spring of 1983. It intended to harvest approximately 400 acres during the 1984 season. Sierra-Angoon opposed both the harvest and the transport of the cut timber across these lands, and filed suit on January 13, 1983. On March 22, 1984, Sierra-Angoon filed a motion seeking a preliminary injunction against a continuation of timber harvesting and related activities. The district court granted the preliminary injunction, finding that the lands conveyed to Shee Atika pursuant to section 506(c) of ANILCA were within the Admiralty Island National Monument and thereby subject to the timber harvesting prohibition of section 503(d) of ANILCA.

We conclude that the district court erred in reading section 503(d) to prohibit timber harvesting on the land conveyed to Shee Atika by section 506(c).

## II

■ An order granting a preliminary injunction must be affirmed unless the court abused its discretion or based its decision on an erroneous legal premise. *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir.1984); *Apple Computer v. Formula Int'l, Inc.*, 725 F.2d 521, 523 (9th Cir.1984). We have determined that a preliminary injunction should be issued upon a clear showing of either (1) probable

success on, the merits and possible irreparable injury or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *City of Las Vegas*, at 1212. These are not really entirely separate tests, but are merely extremes of a single continuum. *Lopez v. Heckler*, 725 F.2d 1489, 1498 (9th Cir.1984), *petition for cert. filed*, 53 U.S.L.W. 3070 (U.S. July 20, 1984) (No. 84–115); *Benda v. Grand Lodge of International Association of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir.1978), *cert. denied*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

In holding that a preliminary injunction was appropriate in this instance, the district court found that Sierra-Angoon had demonstrated a fair chance of success on the merits of their claim that Shee Atika's lands were contained within the Monument and thereby subject to the timber harvesting prohibition contained in section 503(d). The court also found that the balance of hardships in the absence of an injunction tipped sharply in favor of the plaintiffs, and that the public interest reflected in section 503(c) favored an injunction. We disagree with the court's conclusions. Contrary to the district court's analysis, both the language and the legislative history of ANILCA clearly establish that the harvesting ban in section 503(d) applies only to public lands.

## III

■ Sometime after the passage of ANCSA, Congress became aware of the need for a legislative means of maintaining the proper balance between the designation of national conservation areas and the necessary disposition of public lands for more intensive private use. Thus, ANILCA was passed to furnish guidelines for the protection for the national interest in the scenic, natural, cultural and environmental values

---

2. Shee Atika did not participate in the financial part of the ANCSA settlement. Therefore the only asset transferred to it in satisfaction of its aboriginal claims was its portion of the authorized land conveyance.

3. These suits were subsequently consolidated.

4. The congressional compromise disposed of the aforementioned lawsuit.

of the public lands in Alaska and to provide an adequate opportunity for satisfaction of the economic and social needs of the people of Alaska. *See* 16 U.S.C. § 3101. In fulfillment of this dual purpose, ANILCA provides directions to both the Secretary of the Interior, who is in charge of the Native Alaskan affairs, including ANCSA land selections, and the Secretary of Agriculture, who is in charge of the National Forest System. *See* 16 U.S.C. § 3102(12) (the term "Secretary" means the Secretary of the Interior, except that when such term is used with respect to any unit of the National Forest System, such term means Secretary of Agriculture).

Section 503(d) of ANILCA provides: "*Within the Monuments,* the Secretary shall not permit the sale of [sic] harvesting of timber. *Provided.* That nothing in this subsection shall prevent the Secretary from taking measures as may be necessary in the control of fire, insects, and disease." (emphasis added). Notwithstanding the plain language of the statute, limiting its application to land "within the Monument" the district court found that all lands *within the boundaries* of a National Forest System Monument come within the harvesting prohibition of section 503(d). This was an erroneous interpretation of the statute. The phrase "within the Monument" was never intended to apply to private lands which are *within the boundaries* of a national forest conservation system unit.

Section 503(b) specifically identifies Admiralty Island National Monument as being composed of "approximately 921,000 acres of *public lands* ..." (emphasis added). Public lands are defined as land situated in Alaska which, after December 2, 1980, are Federal lands, except land selections of a Native Corporation made under ANCSA. 16 U.S.C. § 3102(3)(B). Federal lands are defined as "lands the title to which is in the United States after December 2, 1980 ...," 16 U.S.C. § 3102(2). Thus, it is clear that the "Monument," by definition, consists solely of public or federally owned lands. Sierra-Angoon concede, and the district court found, that Shee Atika's lands are private lands.

The legislative history of section 503(d) plainly indicates that it was proposed to constrain the Secretary of Agriculture's management of federally owned or public lands. Section 503(d) was drafted by the Senate Committee on Energy and Natural Resources to apply to Misty Fjords National Monument. It was later extended, without change, to cover Misty Fjords *and* Admiralty Island National Monuments. The language of the Senate Committee Report is revealing. It provided that the Misty Fjords Monument would be made up of "public lands" and would be managed by the United States Forest Service. S.Rep. No. 96–413, 96th Cong., 1st Sess. (1979). It further states:

> The committee amendment provides statutory direction to the Forest Service regarding management of the monument. The area is to continue to be managed as part of the Tsongas National Forest subject to specific exceptions ....
>
> (2) The area is closed to the sale or harvest of timber under Forest Service timber sale program ....

*Id.* at 209 (1979). The provision was thus directed at lands that would be subject to the Forest Service timber sale program. The timber sale program does not apply to private lands. *See* 36 C.F.R. § 223.1 (1983) (authorizing the sale of trees and forest products on National Forest System lands) and 16 U.S.C. § 1609(a) ("The National Forest System consist of *federally owned* forest, range, and related lands ....") (emphasis added).

The express language of section 503 further reflects Congress' intention to restrict the use of public lands. Subsection (c) of section 503 provides that the Secretary shall manage the Monuments as units of the National Forest System while subsection (d) provides that: "Within the Monuments, the Secretary shall not permit the sale of [sic] harvesting of timber ...." Congress has made it clear that the Secretary cannot manage private lands which have been conveyed to a Native Corporation. *See* 43 U.S.C. § 1621(i) (stating that the Secretary manages withdrawn land until it is conveyed to a Native Corporation).

Finally, and most importantly, the drafters of ANILCA never intended the mere location of boundary lines on maps delineating the overall conservation system to indicate that private lands conveyed to Native Corporations were to be treated as public lands. The exterior boundaries of the conservation system unit on Admiralty Island were drawn, " 'to include whole ecosystems and to follow natural features.' " As Congressman Udall, the primary sponsor of ANILCA in the House of Representatives, stated prior to the passage of section 503(d):

> We recognize that there are certain lands which have been selected by Native Corporations and which are within the exterior boundaries of some of the conservation system units. This situation occurs because of the location of Native villages along stream courses and because unit boundaries have been drawn, wherever possible, to include whole ecosystems and to follow natural features, and thus also include some Native Corporation lands. *I want to make clear that inclusion of these Native lands within the boundaries of conservation system units is not intended to affect any rights which the Corporations may have under this act, the Alaska Native Claims Settlement Act, or any other law, or to restrict use of such lands by the owning Corporations nor to subject the Native lands to regulations applicable to the public lands within the specific conservation system unit.*

125 Cong.Rec. 9905 (May 4, 1979) (emphasis added). The same point was made during the Senate floor debate on the so-called "Tsongas substitute" which became the version of ANILCA which passed the Senate and eventually became law:

> In the substitute, many parcels of land selected by Native corporations are included within the exterior boundaries of the proposed conservation system units. This situation occurs because the unit boundaries have been drawn, whenever possible, to encompass natural areas or to follow natural features, and thus also to include Native lands which, if the corporations ever decide to dispose of their

property, could become part of the conservation system unit. The fact that Native lands lie within the boundaries of conservation system units is not intended to affect any rights which the corporations have under this act, the Alaska Native Claims Settlement Act, or any other law. It is not our intent, by the inclusion of Native lands within the exterior boundaries of conservation system units, to imply that such inclusion is a revocation of land selections validly filed pursuant to any provision of the Alaska Native Claims Settlement Act. The Native organizations have been given repeated assurances that including their lands within conservation units will not affect the implementation of the Native Claims Settlement Act. We intend to have these assurances translated into practice by the administrative agencies.

> Does the Chairman of our Committee agree with that statement?

> MR. JACKSON: Mr. President, I agree with the Senator from Alaska on this matter.

126 Cong.Rec. S 21882, (remarks of Senators Stevens and Jackson) (August 19, 1980). Congress clearly recognized the possibility that selected private lands might be deemed to be within the Monument and therefore subject to the regulations applicable to public lands by virtue of their location within the general conservation system unit. Thus, section 103(c) was added to ANILCA immediately prior to its enactment as part of the legislative "fine-tuning" process for the express purpose of "specifying that only public lands (and not State owned or private lands) are to be subject to the conservation system unit regulations applying to public lands" and "to make clear that other particular provisions of the bill apply only to public lands." 126 Cong.Rec. H. 30498 (November 21, 1980) (supplementary material furnished by Rep. Udall). Section 103(c) provides, in pertinent part, that "only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit."

16 U.S.C. § 3103(c). In addition to the aforementioned language, section 103(c) specifically states that "no lands which, before, on, or after Dec. 2, 1980 are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units." [5]

Finally, the district court's interpretation of section 503(d) would defeat the very purpose of the conveyance to Shee Atika effectuated by section 506(c). Under ANCSA, the Natives of Sitka, Alaska were to receive title to the surface estate in up to 23,000 acres of land in order to settle and extinguish their aboriginal claims with certainty and in conformity with the real economic and social needs of the Natives. *See* 43 U.S.C. § 1601(a) & (b) and 43 U.S.C. § 1613(h)(3). Given the stated purpose of the land conveyance, it is inconceivable that Congress would have extinguished their aboriginal claims and insured their economic well being by forbidding the only real economic use of the lands so conveyed. This interpretation would effectively nullify section 506(c). It is a familiar rule of law that one provision of a statute should not be interpreted in a way "which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless." *Hughes Air Corp. v. Public Utilities Commission,* 644 F.2d 1334, 1338 (9th Cir.1981).

### IV

When sections 102, 103(c), 503(d) and 506(c) of ANILCA are read harmoniously, it becomes clear that Congress intended that the private status of the lands conveyed to Shee Atika is to remain unaffected by their inclusion within the exterior boundaries of the conservation system unit on Admiralty Island. Thus, although clearly within the boundaries of the Admiralty Island conservation unit, the lands con-

veyed to Shee Atika remain private lands, and thereby not "within the Monument." They are therefore not subject to the prohibition against timber harvesting contained in section 503(d).

The district court erred in relying on a misinterpretation of section 503(d) to conclude that Sierra-Angoon had demonstrated a fair chance of success on the merits of this claim, as well as concluding that the public interest enunciated by Congress in this Act favored the injunction.

### V

■ Sierra-Angoon also sought to enjoin timber harvesting based on subsistence rights protected by ANILCA § 506(a)(2) and §§ 801–816. They urge that we uphold the injunction on this alternate ground, although the district court ruled against them on this issue.

Section 506 of ANILCA contains three discrete subsections, each conveying a portion of land to an Alaska Native Corporation pursuant to ANCSA and a fourth, reimbursing the Native Corporations for certain previously incurred land selection costs. Section 506(a) contains the conveyance to Kootznoowoo, Inc., representing the Natives of Admiralty Island. Section 506(a)(2) provides that:

> [n]othing in this section shall affect the continuation of the opportunity for subsistence uses by residents of Admiralty Island, *consistent with title VIII of this act.*

(emphasis added).

Since the conveyance to Shee Atika was within the same "section" (ANILCA § 506(c)), Sierra-Angoon argues that allowing timber harvesting on the land conveyed to Shee Atika would "affect the continuation of ... subsistence uses by residents of Admiralty Island" on Shee Atika's private

---

**5.** Section 103 is not the only instance in which Congress was very careful about specifically indicating that private lands are not to be restricted by virtue of their location within the boundaries of a conservation system unit. In other instances where Congress *has* wanted to affect private lands that fall within the boundaries of a conservation unit, it has used the expression

"within the boundaries of the Monuments" and has made clear its intent to affect private lands. For example, *see* section 22(g) of ANCSA, 43 U.S.C. § 1621(g) regarding "lands lying within the boundaries of a National Wildlife Refuge ...," and section 906(*o*) of ANILCA, Pub.L. 96–487, 1980 U.S.Code Cong. & Admin.News 5234.

land. ANILCA § 506(a)(2). However, the continuation of subsistence uses is guaranteed only to the extent consistent with Title VIII of ANILCA (§§ 801–816). Title VIII places restrictions on the management of public land in Alaska in order to minimize effects on Alaska residents' subsistence lifestyles. *See* ANILCA §§ 801–816.

The district court held that section 506(a)(2), in order to be "consistent with title VIII," must refer only to subsistence uses on public lands. We agree. The section assures Admiralty Island residents that the land conveyed to them was not intended to supplant their subsistence rights guaranteed by Title VIII. *Cf. People of Village of Gambell v. Clark,* 746 F.2d 572, at 576 (9th Cir.1984) (ANSCA land grants were intended to extinguish aboriginal subsistence rights). To hold otherwise would defeat the purpose of the conveyance to Shee Atika.

Sierra-Angoon also argues that logging on Shee Atika's land has spillover effects on public land on Admiralty Island. This, Sierra-Angoon argues, constitutes "use" of the public land, thus requiring a subsistence study under ANILCA § 810. We do not reach the issue whether Title VIII places any restrictions on Shee Atika's ability to harvest timber. We agree with the district court that Sierra-Angoon failed to meet its burden of showing irreparable harm from the effects of this years timber harvest (400 acres).

Accordingly, the order granting the preliminary injunction must be vacated. We hereby REVERSE and REMAND to the district court for a final determination of the triable issues of fact presented by the parties.